**Lord Simon CAIRNS, et al., Plaintiffs,**

v.

**FRANKLIN MINT COMPANY, et al., Defendants.**

**No. CV 98–3847 RAP (BQRx).**

United States District Court, C.D. California.

Oct. 16, 1998.

Mark S. Lee, Cara R. Burns, Shari Mulrooney Wollman, Manatt, Phelps & Phillips, LLP, Los Angeles, CA, for Plaintiffs.

Robert A. Meyer, Douglas E. Mirell, Robert N. Treiman, Daniel J. Friedman, Shanda W. Connolly, Loeb & Loeb LLP, Los Angeles, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE TO STRIKE PORTIONS OF, PLAINTIFFS' FIRST AMENDED COMPLAINT; AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AGAINST ALL DEFENDANTS**

PAEZ, District Judge.

## I.

### Introduction and Factual Allegations [1]

Diana, Princess of Wales ("Princess Diana") was one of the most beloved, most photographed and most talked about celebrities of the last seventeen years. As a result of her tragic and untimely death, her name has been at the crest of the wave of global popular culture for over a year. Princess Diana's public persona is now the subject of this dispute about the right to use her name and likeness to market goods and services.

This action involves defendants' production and advertisement of jewelry, commemorative plates, sculptures and dolls depicting Princess Diana. Plaintiffs are the executors of the Estate of Diana, Princess of Wales [2] (the "Estate") and trustees of the Diana, Princess of Wales Memorial Fund (the "Fund").[3] The Fund is a non-profit charitable trust organized under the laws of England and Wales, which, through its U.S. entity, engages in charitable activities in the United States and California. Defendant Roll International Corporation, Inc. ("Roll") is the managing general partner of defendant the Franklin Mint Company. ("Franklin Mint"). Roll allegedly has its principal place of business in Los Angeles, while the Franklin Mint has its principle place of business in Pennsylvania. Defendants Stewart Resnick and Lynda Resnick, who allegedly reside in California, own, control and/or are general partners of Roll and the Franklin Mint.

Princess Diana died on August 31, 1997. Her assets passed by will to her Estate. On September 30, 1997, on behalf of the executors of the Estate, attorney Anthony Robert Julius filed with the State of California a Registration of Claim as Successor–in–Interest pursuant to California Civil Code § 990. In addition, the Estate allegedly filed three applications for federal trademark registrations in various classes for "Diana Princess of Wales" and "Diana Princess of Wales Memorial Fund" with priority dates of September 4, 1997 and September 11, 1997.

The Fund was established on September 4, 1997 to accept donations to be given to various charities with which Princess Diana was associated during her lifetime. Plaintiffs allege that the Fund is, subject to certain reservations, the only charity authorized by the Estate to engage in charitable activities and utilize Princess Diana's name, likeness, image, and marks. Plaintiffs allege that the Estate granted the Fund exclusive licenses, subject to certain reservations, to the name and likeness of Princess Diana and to the trademarks "Diana, Princess of Wales" and "Diana, Princess of Wales Memorial Fund." The Charities Commission for England and Wales allegedly approved those licenses to the Fund, and the parties allegedly completed the licenses on ·February 27, 1998. Plaintiffs allege that the Fund has used and authorized the use of its trademarks on products and services in the United States.

On or about June 25, 1997, defendant Lynda Resnick purchased a dress sold by Princess Diana at a charity auction. According to plaintiffs, Resnick stated when she bought the dress that she did not intend to commercially exploit it. Plaintiffs allege that on August 8, 1997, however, defendants filed an intent to use trademark application for "Diana, Forever A Princess." On September 4, 1997, defendant Stewart Resnick, on behalf of the other defendants, sought permission to utilize Princess Diana's name and likeness on products and in advertising. In October 1997, plaintiffs refused to authorize defendants' use of Princess Diana's name and likeness. Thereafter, plaintiffs allegedly advised defendants both orally and ·in writing that any exploitation of Princess Diana's identity by defendants was unauthorized.

---

1. All factual allegations are drawn from plaintiffs' First Amended Complaint.

2. The Honorable Frances Ruth Shand Kydd, Lady Elizabeth Sarah Lavinia McCorquodale, and the Right Reverend and Right Honorable Richard John Carew Chartres, Bishop of London.

3. Lord Simon Cairns, John Eversley, Michael Gibbins Lvo, F.C.A., JP, Anthony Julius, Lady Sarah McCorquodale, Vivienne Parry, Baroness Jill Pitkeathley OBE, John Reizenstein, Christopher Spence MBE, and Nalini Varma. The Executors of the Estate, the Honorable Frances Ruth Shand Kydd, Lady Elizabeth Sarah Lavinia McCorquodale, and the Right Reverend and Right Honorable Richard John Carew Chartres, Bishop of London, are also trustees authorized to act on behalf of the Fund.

On September 4, 1997, defendants allegedly filed trademark applications for "Diana, Queen of Our Hearts," "Diana, Queen of Hearts," "Diana, Angel of Mercy" and "Diana, the People's Princess" for use with jewelry, plates, sculptures and dolls. Likewise, on September 19, 1997, defendants allegedly filed applications for "Design of Diana Wearing Tiara," "Design of Head of Diana Wearing Ribbon," "Design of Princess Diana Wearing Ribbon and Princess Diana" and "Design of Princess Diana Wearing a Tiara and Princess Diana" for use with similar goods. According to plaintiffs, the Patent and Trademark Office Examining Attorney has issued non-final office action letters to defendants rejecting their various trademark applications, in part because the marks falsely suggest a connection with Princess Diana.

Plaintiffs allege that defendants have promoted and sold various items of unauthorized Princess Diana merchandise throughout the United States, including a "Diana, Princess of Wales Porcelain Portrait Doll" featuring a reproduction of the dress bought by Lynda Resnick, a "Diana, Queen of Hearts Jeweled Tribute Ring," a "Diana, England's Rose Diamond Pendant," a "Princess Diana Tiara Ring," an "England's Rose Heirloom Collector Plate," a "Diana, The People's Princess Doll," a "Princess Diana Crown Ring" and the "Diana, Forever Sparkling Classic Drop Earrings." Defendants' products and advertising feature Princess Diana's name and likeness.

Plaintiffs allege that defendants are using their advertising to improperly benefit from the goodwill associated with Princess Diana's identity. According to plaintiffs, defendants attempt to conceal their efforts to benefit from Princess Diana's death by falsely and misleadingly implying an endorsement, association or affiliation with Princess Diana, her Estate and the Fund. Defendants allegedly do this through (a) their use of Diana's name and likeness; (b) their characterization of their products as a way to "honor" or "commemorate" Diana; (c) their references to Diana's charitable activities; (d) their offer of a "certificate of authenticity" with their merchandise; and (e) their statement that "100% of the ... price [of the products] will be donated to Diana, Princess of Wales' charities."

Plaintiffs assert claims against all defendants for (1) false designation of origin and false endorsement under the Lanham Act; (2) federal trademark dilution in violation of 15 U.S.C. § 1125(c); (3) infringement of California's statutory right of publicity, California Civil Code § 990; (4) false advertising under the Lanham Act; and (5) unfair competition and false and misleading advertising in violation of California Business and Professions Code §§ 17200 and 17500, et seq.

Pending before the Court are (1) Defendants' Request for Judicial Notice in Connection with Defendants' Motion to Dismiss Plaintiffs' Complaint; (2) a Motion by Defendants Franklin Mint Company, Roll International Corporation, Inc., Stewart Resnick and Lynda Resnick to Dismiss, or in the Alternative to Strike Portions of, Plaintiffs' First Amended Complaint; (3) Plaintiffs' Motion for Preliminary Injunction; and (4) Defendants' Objections to and Motion to Strike Declarations Submitted by Plaintiffs in Support of Motion for Preliminary Injunction.

Upon consideration of the papers submitted by the parties' in conjunction with each motion, and the oral arguments of counsel, defendants' request for judicial notice of a complaint in a Delaware declaratory relief action by defendants' competitor against the Fund is **DENIED** as the evidence proffered is not relevant to the questions before the Court.

Defendants' Motion to Dismiss or Strike is **GRANTED IN PART AND DENIED IN PART.** The motion to dismiss plaintiffs' Third Claim for relief under Civil Code § 990 is **GRANTED** because choice of law principles dictate application of the law of Great Britain. Defendants' motion to dismiss plaintiffs' First Claim for relief for false endorsement and false origin is **DENIED** because likelihood of confusion is a question of fact. Defendants' motion to dismiss plaintiffs' Second Claim for relief is **DENIED** because plaintiffs sufficiently allege that their mark had acquired secondary meaning as a source of the charitable activities of Diana, Princess of Wales. Defendants' motion to dismiss plaintiffs' Fourth and Fifth Claims for relief for false advertising under the Lanham

Act and under California law, respectively is **DENIED**.

Defendants' motion to strike language in the complaint referring to defendants as "vultures feeding on the dead" is **GRANTED**. The motion to strike plaintiffs' claim for damages under § 990 is moot.

Finally, plaintiffs' motion for a preliminary injunction is **DENIED** because plaintiffs have failed to establish a likelihood of success on the merits with respect to their false origin and false endorsement, trademark dilution, and false advertising claims.

## II.

### Discussion

### A. Motion to Dismiss

#### 1. Standard

■ A motion to dismiss under Fed. R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Accordingly, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir.1994). The court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1989); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988). In fact, even if a document is neither submitted with the complaint nor explicitly referred to in the complaint, the district court may consider the document in ruling on a motion to dismiss so long as the complaint necessarily relies on the document and the document's authenticity is not contested. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998).

■ Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Development*

*Corp.*, 108 F.3d 246, 249 (9th Cir.1997). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir.1994). The court is not required, however, to accept "conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg*, 18 F.3d at 754–55.

■ Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). The notice pleading standard set forth in Rule 8 establishes "a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan*, 108 F.3d at 248 (citations omitted). Consequently, a court may not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by the inclusion of additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995).

#### 2. Third Claim: California Civil Code § 990

Defendants move to dismiss plaintiffs' Third Claim for relief under California Civil Code § 990, arguing that British law should apply because Princess Diana was domiciled in Great Britain at the time of her death. Great Britain does not recognize a descendible right of publicity. *See* J. Thomas McCarthy, *Rights of Publicity & Privacy*, § 6.21 (West 1998) (discussing absence of right of publicity under English law, including recent cases recommending legislative action); *Bi–Rite Enterprises, Inc. v. Bruce Miner Co., Inc.*, 757 F.2d 440, 442 (1st Cir. 1985) ("Great Britain does not recognize a

right of publicity.") (citing *Tolley v. Fry,* 1 K.B. 467 (1930)); *Nice Man Merchandising, Inc. v. Logocraft Ltd.,* 1992 WL 59133, 23 U.S.P.Q.2d 1290, 1293 (E.D.Penn.1992) (Great Britain does not recognize right to control commercial exploitation of personal names or likenesses).

By contrast, California law provides a statutory post-mortem right of publicity. Cal. Civ.Code § 990;[4] *see also* McCarthy, *Rights of Publicity & Privacy,* § 6.4[F][6][a] (§ 990 enacted to legislatively overrule California Supreme Court holding that California law recognized little, if any, post-mortem right to publicity) (citing *Lugosi v. Universal Pictures,* 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979)). Section 990 creates a state registration scheme by which a person claiming to be a successor-in-interest to post-mortem publicity rights may register a claim with the California Secretary of State. Only two courts have applied § 990 in published decisions. *See Astaire v. Best Film & Video Corp.,* 116 F.3d 1297, *as amended,* 136 F.3d 1208 (9th Cir.1998), *cert. denied,* —— U.S.——, 119 S.Ct. 161, 142 L.Ed.2d 132 (1998); *Joplin Enterprises v. Allen,* 795 F.Supp. 349, 351 (W.D.Wash.1992). Neither *Astaire* nor *Joplin* addressed the choice of law question presented here.

■ "In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California." *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1164 (9th Cir.1996). Under California law, "[a] separate choice-of-law inquiry must be made with respect to each issue in a case." *Application Group, Inc. v. Hunter Group, Inc.,* 61 Cal.App.4th 881, 896, 72 Cal.Rptr.2d 73 (1st Dist.1998). Here, we consider first what law applies to determine whether plaintiffs have a right of publicity in Princess Diana's name and likeness.

■ California generally resolves conflict of law questions through a "governmental interest" analysis. *Reich v. Purcell,* 67 Cal.2d 551, 554, 63 Cal.Rptr. 31, 432 P.2d 727 (1967); *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1506 (9th Cir.1993). This approach requires the court to "find the proper law to apply based upon the interests of the litigants and the involved states." *Offshore Rental Co. v. Continental Oil Co.,* 22 Cal.3d 157, 161, 148 Cal.Rptr. 867,

---

**4.** California Civil Code § 990 provides in relevant part:

(a) Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the person or persons specified in subdivision (c), shall be liable for any damages sustained by the person or persons injured as a result thereof.

(b) The rights recognized under this section are property rights, freely transferable, in whole or in part, by contract or by means of trust or testamentary documents ....

(c) The consent required by this section shall be exercisable by the person or persons to whom the right of consent (or portion thereof) has been transferred in accordance with subdivision (b)[.]

(f) (1) A successor-in-interest to the rights of a deceased personality under this section or a licensee thereof may not recover for damages for a use prohibited by this section that occurs before the successor-in-interest or licensee registers a claim of the rights under paragraph (2).

(2) Any person claiming to be a successor-in-interest to the rights of a deceased personali-

ty under this section or a licensee thereof may register that claim with the Secretary of State on a form prescribed by the Secretary of State and upon payment of a fee of ten dollars ($10). The form shall be verified and shall include the name and date of death of the deceased personality, the name and address of the claimant, the basis of the claim, and the rights claimed....

(h) As used in this section, "deceased personality" means any natural person whose name, voice, signature, photograph, or likeness has commercial value at the time of his or her death, whether or not during the lifetime of the natural person the person used his or her name, voice, signature, photograph, or likeness on or in products, merchandise or goods, or for purposes of advertising or selling, or solicitation of purchase of, products, merchandise, goods or services....

(k) ... [I]t shall be a question of fact whether or not the use of the deceased personality's name, voice, signature, photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a).

583 P.2d 721 (1978). With respect to personal property, however, California law dictates that "[i]f there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile." Cal. Civ.Code § 946. Defendants contend § 946 governs our inquiry and mandates application of British law; plaintiffs argue the choice of law question must be resolved under California's standard governmental interest analysis.

 The post-mortem publicity rights recognized in § 990 are property rights.[5] Cal. Civ.Code § 990(b); *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir.1988) (rights under § 990 and analogous common law rights are property rights; appropriation of common law rights is a tort in California). Consequently, § 946 applies on its face and governs at least the initial conflict of laws question. *See Estate of Nolan*, 135 Cal. App.2d 16, 20, 286 P.2d 899 (1st Dist.1955) (§ 946 is part of rules governing conflict of laws). As the Eleventh Circuit explained in a right of publicity case arising before § 990 was enacted:

> Given the explicit language of Cal. Civil Code § 946, we can reasonably conclude that although in California the "governmental interests analysis" applies to choice of law issues arising from a question of whether an existing right has been tortiously infringed, the law of the domicile controls to decide whether the allegedly

infringed property right exists in the first instance.

*Acme Circus Operating Co., Inc. v. Kuperstock*, 711 F.2d 1538, 1541 (11th Cir.1983). Although plaintiffs attempt to distinguish *Acme* and other cases applying the law of the decedent's domicile to determine whether a right of publicity exists, *Acme* appears to be in line with the general rule. As McCarthy explains:

> At first glance, the *Elvis Presley*[6] and *Marx Productions*[7] cases and their progeny seem contrary to other Right of Publicity conflicts cases in that *Presley* and *Marx* look to the law of the domicile of the person whose rights are asserted. But in fact, what distinguishes these cases is that they were searching for the appropriate law to apply to answer the question of whether the Right of Publicity was a property right included in the estate of the deceased persons. The traditional rule ... for determining the testamentary ... disposition of personal property is to look to the law of the decedent's domicile at the time of death.... Viewed in this light, [such cases] occupy a distinct category of conflicts law applicable only to [the] determination of what property is includable in a decedent's estate. It makes sense to apply the law of decedent's domicile to such an issue in order to avoid having the post mortem Right of Publicity viewed as "property" in the courts of one state and

---

**5.** McCarthy provides a succinct summary of some of the problems that arise when the right of publicity is characterized as a property right for choice of law purposes:

> One obvious difficulty with the strict categorization approach of the First Restatement is that when both a tort and property theory are asserted, the law of state A might apply to the tort count and the law of state B to the property count. That is hardly a rational or efficient approach.

McCarthy, *Rights of Publicity and Privacy*, § 11.2[B] at 11–8. For example, here, the law of Britain applies for purposes of determining whether the property right exists, California law might govern whether that right (if it existed) had been infringed, and federal law governs whether plaintiffs may assert a claim based on parallel rights under the Lanham Act. McCarthy continues:

> The categorization approach also presents great difficulties of characterization. If the

Right of Publicity is labeled "property," the law of the "situs" of property would apply. But for a nationally known celebrity, where is the "situs" of the property right in the Right of Publicity? At the person's domicile? And if plaintiff is not the celebrity, but his or her exclusive licensee, does the "property" in the Right of Publicity exist in the state of incorporation of the exclusive licensee, so that the law of several different states applies to several different plaintiffs?

*Id.* Although the Court notes some of the pitfalls inherent in the approach applied today, the Court is neither empowered nor inclined to modify California law, regardless of uncertainties created by the interplay between §§ 990 and 946.

**6.** *Estate of Presley v. Russen*, 513 F.Supp. 1339 (D.N.J.1981).

**7.** *Groucho Marx Prods., Inc. v. Day & Night Co.*, 689 F.2d 317 (2d Cir.1982).

not in another as to the estate of the same deceased person.

McCarthy, *Rights of Publicity and Privacy,* § 11.3[D][3][c].[8]

■ The traditional common law rule embodied in Civil Code § 946 dictates that personal property is generally controlled by the law of a decedent's domicile at the time of his or her death. *See Estate of Moore,* 190 Cal.App.2d 833, 842, 12 Cal.Rptr. 436 (4th Dist.1961). This common law rule, "sometimes called the maxim mobilia sequuntur personam, has been recognized uniformly throughout California's history." *Id.; see also Delaware v. New York,* 507 U.S. 490, 503, 113 S.Ct. 1550, 123 L.Ed.2d 211 (1993) (noting common law rule that intangible personal property is found at the domicile of the owner). Thus, unless the general rule is inapplicable, whether a right to publicity in Princess Diana's name and likeness passed to her Estate is a question controlled by the law of her domicile at the time of her death: Great Britain.

■ Section 946 provides an exception to the general rule where there is "law to the contrary, in the place where personal property is situated[.]" The exception is applicable, however, only when contrary law represents the Legislature's intent that the common law rule not apply in that context. *Id.* As the *Nolan* court explained: "The obvious meaning of [§ 946] is that personal property is governed by the law of the domicile of its owner, unless a general or specific law where the property is situated provides that the law of the domicile shall not govern." *Nolan,* 135 Cal.App.2d at 19, 286 P.2d 899 (citations omitted). Where property is deemed to be situated in California, the law to the contrary may be another provision of California law. *Id.*

At first glance, it appears that the first step in determining whether the § 946 exception applies is to resolve where the property at issue is situated. Of course, § 946 itself provides the general rule that personal property is situated at the domicile of the owner. As a result, the exception appears to make sense only where there is a reason to assign the "situs" of the property based on factors other than the owner's domicile. Such a reason will necessarily be embodied in law contrary to the general rule that the domicile controls. To determine whether the exception applies, then, the Court necessarily conflates the two-part inquiry into where the property is "situated" for purposes of the exception and whether there is law to the contrary in that forum. The task is made simple by assuming, for purposes of assessing whether there is law to the contrary, that the general rule does not apply and that the property is situated in California as plaintiffs contend.

■ Plaintiffs first rely on a number of California cases considering § 946 in the context of disputes involving jurisdiction over personal property. In a divorce proceeding involving jurisdiction over proceeds from a pension plan, the California Supreme Court explained:

> An intangible, unlike real or tangible personal property, has no physical characteristics that would serve as a basis for assigning it to a particular locality. The location assigned to it depends on what action is to be taken with reference to it.

*Waite v. Waite,* 6 Cal.3d 461, 467, 99 Cal. Rptr. 325, 492 P.2d 13 (1972), *superseded by statute on other grounds as stated in In re Marriage of Carnall,* 216 Cal.App.3d 1010, 1019, 265 Cal.Rptr. 271 (4th Dist.1989); *see*

---

8. Several other sources tangentially support application of the law of the decedent's domicile to questions concerning the existence of a right of publicity. *See White v. Samsung Electronics America, Inc.,* 989 F.2d 1512, 1518 (9th Cir. 1993) (Kozinski, J., dissenting from denial of petition for rehearing and rejection of suggestion for rehearing en banc) ("A right of publicity created by one state applies to conduct everywhere, so long as it involves a celebrity domiciled in that state."); *Allison v. Vintage Sports Plaques,* 136 F.3d 1443, 1446 n. 6 (11th Cir. 1998) (noting choice of law question typically

complicated by fact that right of publicity is treated in some jurisdiction as property right and in others as tort); McCarthy, *Rights of Privacy & Publicity,* § 6.5[A][A] n. 2 (noting 1994 Indiana statute purports to provide right of publicity regardless of state of domicile of deceased person and stating general rule of conflicts is to apply law of state of domicile of decedent to determine whether there is post-mortem right of publicity), § 11.3[D][3][a] (discussing general conflicts rule assessing existence of post-mortem right of publicity by reference to law of decedent's domicile).

*also American Standard Life & Accident Ins. Co. v. Speros,* 494 N.W.2d 599, 605 (1993) (applying *Waite* rule in case involving jurisdiction to garnish wages). In *Waite* the purpose of assigning the situs of the pension rights at issue was to establish jurisdiction to award those rights on dissolution of the marriage. *Waite,* 6 Cal.3d 461, 99 Cal.Rptr. 325, 492 P.2d 13. Likewise, in *American Standard* the purpose of assigning the situs of the wages at issue was to determine the appropriate jurisdiction in which to garnish them. *American Standard,* 494 N.W.2d at 605. Where the issue is whether the court has jurisdiction in rem over personal property, the fact that the property owner was domiciled in a particular state is not sufficient to give that state jurisdiction over the property. *Waite,* 6 Cal.3d at 461, 99 Cal.Rptr. 325, 492 P.2d 13. Instead, California courts determine whether jurisdiction in rem is available by looking to the totality of the contacts with each state and by considering how those contacts influence the overarching question of how to ensure fair play and substantial justice. *Id.* Neither *Waite* nor *American Standard* involved intangible personal property devised by will.

■ Here, the purpose of assigning a situs to the asserted right of publicity is to determine whether that right was included in the personal property devised by Princess Diana to her Estate. Consequently, no property exists until the choice of law question is answered. This is quintessentially the type of situation in which the general rule of § 946 is meant to apply because looking to the law of the domicile ensures that the property right will not be recognized as part of the Estate by some jurisdictions and not by others. The rule articulated in *Waite* is tailored to a concern not present in this case: namely, which court can properly assert jurisdiction in rem over existing property rights to resolve a dispute about their disposition.

■ Even assuming that the right of publicity in Princess Diana's name and likeness is situated in California for purposes of the § 946 analysis, plaintiffs present no law contrary to the general rule that the law of the decedent's domicile governs with respect to personal property. Certainly, *Waite* and its progeny do not suggest that the California Legislature intended to abrogate § 946 in the context of intangible property devised by . will in a foreign jurisdiction.[9]

Although § 990 was enacted long after § 946, nothing in § 990 suggests that the California Legislature intended to exempt that section from the general rule that the law of a decedent's domicile governs questions regarding what property is included in a decedent's estate. Had it intended to create such an exception, the Legislature could easily have included a choice of law provision indicating that California law dictates whether the right of publicity is a property right included in the estate of a deceased person. Thus, generally speaking, § 990 does not constitute law to the contrary that might vitiate the general choice of law rule set forth in § 946.

More specifically, plaintiffs argument that their right of publicity is located in California because the document ostensibly embodying the right—the registration form required under § 990—is located in California is not contrary to the general rule that the law of a decedent's domicile controls with respect to personal property. Nothing in § 990 suggests that the registration scheme is intended to function as a means of locating the situs of intangible property rights in California. Moreover, the statute provides no means by which claims are to be verified and is not

9. In fact, because *Waite* applied § 946 in a context not involving treatment of personal property devised by will, plaintiffs' attempt to import the *Waite* rule here results in circular reasoning that ultimately brings us back to the general rule. First, the rule that intangible property is deemed to be situated at the domicile of the owner does not provide courts of another forum with jurisdiction in rem over that intangible property. Instead, the test for jurisdiction in rem requires consideration of the totality of the contacts with the state involved. Nonetheless, because the issue here is not whether the Court has jurisdiction over the personal property at issue but whether that property was devised by will to the Estate, *Waite* does not involve law contrary to the general rule that the law of decedent's domicile governs personalty. Consequently, the general rule applies. In short, *Waite* does not support a determination that the asserted personal property is situated in California or governed by California law.

itself a negotiable instrument. Under such circumstances, the registration form is not an embodiment of the right. To the contrary, registration under § 990 simply provides public documentation of an asserted claim for the benefit of potential disputants and licensees. *See* McCarthy, *Rights of Publicity & Privacy,* § 6.4[f][6][b]. Consequently, the registration provision of § 990 does not constitute law to the contrary within the meaning of § 946.

Finally, plaintiffs' suggestion that their asserted entitlement to control commercial exploitation of Princess Diana's likeness is an interest in a "right to publicity claim" and, therefore, a "chose in action" governed by California law begs the very question at issue by assuming a priori that plaintiffs have a claim under § 990. Likewise, the rule that a debt has its situs at the domicile of the debtor is inapplicable here because plaintiffs have not established the existence of a debt. *Cf. In re Waits' Estate,* 23 Cal.2d 676, 146 P.2d 5 (1944) (cause of action for wrongful death had situs where administrator was appointed to bring suit); *Waite,* 6 Cal.3d at 467–68, 99 Cal.Rptr. 325, 492 P.2d 13 (where issue is jurisdiction to compel obligor to pay one claimant and not another, situs of debt or claim is any state where personal jurisdiction over debtor is available).

In any event, even if California were the situs of the property, the law of Great Britain would control because no California law provides that the law of the decedent's domicile should not apply. *See Nolan,* 135 Cal.App.2d at 19, 286 P.2d 899. In *Moore,* the Court considered whether distribution of personal property situated in California was governed by the law of decedent's domicile, Florida, or by California law. *Moore,* 190 Cal.App.2d at 842, 12 Cal.Rptr. 436. Finding that former California Probate Code § 26 was not in conflict with the traditional rule stated in Civil Code § 946, the court concluded that "the disposition of intangible personal property situated in California is controlled by the law of the [decedent's] domicile[.]" *Id.* at 843, 12 Cal.Rptr. 436 (considering bank accounts in California to be "intangible personal property").[10] Thus, even if the intangible property at issue—the post-mortem right of publicity in Princess Diana's name and likeness—were situated in California, the law of Great Britain would apply.

Cases applying California Civil Code § 3344, which governs a living person's right of publicity in his or her own identity, have not addressed § 946, and the Court need not consider the relationship between § 3344 and the property choice of law statute. Sections 3344 and 990 are not parallel in all respects, and rules adopted with respect to one section must be evaluated in light of the statutory language of the other before they can be applied wholesale. Nonetheless, it is worth noting that cases based on publicity rights under § 3344 have typically selected the law of the property owner's domicile when resolving choice of law questions under California's governmental interests test. *See Midler,* 849 F.2d at 463; *Fleury v. Harper & Row Publishers, Inc.,* 698 F.2d 1022 (9th Cir.1983); *Motschenbacher v. R.J. Reynolds Tobacco Co.,* 498 F.2d 821, 825–26 (9th Cir. 1974); *Page v. Something Weird Video,* 908 F.Supp. 714, 716 (C.D.Cal.1995).[11] The courts in *Midler, Motschenbacher, Fleury,* and *Page* each relied upon the celebrity's

---

**10.** Combining the general rule that the law of the decedent's domicile governs personal property with the supplemental rule, derived from the exception, that intangible property situated in California is controlled by the law of the decedent's domicile, we reach the same result obtained by following the much simpler rule articulated by the California Supreme Court in an early decision applying § 946: "intangible property ... has its situs for all purposes, including administration, in the domicile of the decedent." *See In re Layton's Estate,* 217 Cal. 451, 462, 19 P.2d 793 (1933).

**11.** In *Page,* this Court applied California's governmental interest choice of law test and concluded that California local law applied to Page's right of publicity claim under Civil Code § 3344. *Page,* 908 F.Supp. at 717. While the two companion statutes, §§ 3344 and 990, respectively establish the parameters of living and deceased persons' publicity rights, § 3344 contains no definitive statement that the rights protected under the statute are "property rights." Consequently, the Court's decision here has no bearing on choice of law questions presented under § 3344. Moreover, in *Page,* as in any case involving a plaintiff domiciled in California, reliance on § 946 would typically result in the application of California local law.

domicile as the primary factor in selecting the governing law. Moreover, application of § 946 would have resulted in the same outcome in each of the cases cited because each plaintiff was a California resident.

Cases applying the choice of law rules of other fora have no bearing on the outcome under California law. For example, in *Bruce Miner*, the First Circuit concluded that, under Massachusetts law, it was unnecessary to fit the right of publicity into one category— Tort, Property, Contract, etc.—because the "most significant relationship" analysis allows for greater flexibility than single factor choice of law analysis. *Bruce Miner*, 757 F.2d at 442–43. While that court considered as one factor in the analysis the domicile of the person whose name or likeness was allegedly being exploited, Massachusetts has no law parallel to California Civil Code § 946, which dictates that domicile is dispositive. *Id.* at 445–46 (rejecting rule based on performer's domicile as unworkable and confusing, in part because of uncertainty created for foreign performers doing business in the United States). Closer to home, the district court in *Joplin* applied Washington choice of law rules and concluded that California local law governed because the right of publicity is a property right, Janis Joplin was domiciled in California, and Joplin's right of publicity descended to her devisees in California. *Joplin*, 795 F.Supp. at 350. Once again, although the court in *Joplin* relied heavily on the law of the decedent's domicile, California choice of law rules were not employed.[12] Cases applying choice of law rules not parallel to California's rules are of little use in our analysis, except insofar as they support the conclusion that domicile is at least an important, if not dispositive, consideration in se-

lecting the law applicable to a right of publicity.

■ Although there is no indication in § 990 that the legislature intended to limit the post-mortem right of publicity to California domiciliaries, the statute clearly identifies the right as a property right, and § 946 governs choice of law questions involving personal property. As the above discussion demonstrates, under California's choice of law rules, the law of the decedent's domicile governs whether a right of publicity is included in the decedent's estate. As a result, the existing statutory scheme permits only California domiciliaries, and perhaps domiciliaries of other states that recognize a right of publicity, to devise a right of publicity to their heirs under § 990.[13] Nonetheless, in light of the Court's conclusions that the law of Great Britain governs and that British law dictates that the Estate does not include a right of publicity, the Court need not consider what law governs the asserted claim for infringement of the right of publicity. *See Acme*, 711 F.2d at 1541. For the foregoing reasons, the Third Claim for Relief is properly dismissed.

### 3. First Claim: False Designation of Origin

■ Section 43(a) of the Lanham Act provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

---

**12.** Taking a slightly different tack, plaintiffs rely on *Button Master*, where the court applied New York's property choice of law rules to determine whether plaintiffs had protectible rights of publicity. *Button Master*, 555 F.Supp. at 1197. After stating that the law of the states in which plaintiffs or their exclusive licensees resided would control, that court concluded that Georgia law controlled with respect to the rights of publicity of residents of Great Britain who marketed themselves exclusively through a Georgia based merchandising representative. *Id.* Thus, in *Button Master*, the choice of law determination was based on the residence of the British performers'

exclusive licensee. *Button Master* is of no aid to plaintiffs here, however, because even if we were to look to the law of the domicile of the devisees or the situs of the Estate, all plaintiffs reside in Great Britain.

**13.** It is worth noting that New York's choice of law rules focus on the situs of the property and, therefore, on the residence of the plaintiff, to determine whether a plaintiff has a protectible right of publicity. *See Button Master*, 555 F.Supp. at 1197 (citing *Groucho Marx Productions v. Day & Night Co.*, 689 F.2d 317, 319 (2d Cir.1982)).

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of her or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). As the Ninth Circuit has explained it, § 43(a) provides two bases for liability: "(1) false representations concerning the origin, association or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress or other device ('false association'), and (2) false representations in advertising concerning the qualities of goods or services ('false advertising')." *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir. 1992) (citations omitted). Here, plaintiffs assert a false endorsement claim as their First Claim for relief and a false advertising claim as their Fourth Claim for relief. The Court deals with the latter claim separately below.

■ A celebrity false endorsement claim is cognizable under § 43(a). *Id.*

A false endorsement claim based on the unauthorized use of a celebrity's identity is a type of false association claim for it alleges the misuse of a trademark, i.e., a symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product. *Waits*, 978 F.2d at 1110. Thus, where a celebrity plaintiff asserts a false endorsement claim, the "mark" at issue is "the celebrity's persona and the strength of the mark refers to the level of recognition the celebrity enjoys." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 n. 1 (9th Cir.1997). The " 'goods' concern the reasons for or the source of the plaintiff's fame." *White*, 971 F.2d at 1400.

■ A false endorsement claim is available where defendants' conduct has allegedly created "a likelihood of confusion as to whether plaintiffs were endorsing [defendants'] product." *Wendt*, 125 F.3d at 812.

All other things being equal, it will often be easier for a plaintiff to prove "identifiability" infringement of the right of publicity than to prove "likelihood of confusion" infringement of a trademark right.... As Judge Nies observed: "There may be no likelihood of such confusion as to the source of the goods even under a theory of 'sponsorship' or 'endorsement,' and, nevertheless, one's right of privacy, or the related right of publicity, may be violated."

McCarthy on Trademarks, § 28:12 at 28–15 (quoting *University of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.*, 703 F.2d 1372, 1376 (Fed.Cir.1983)). To assess likelihood of confusion, courts in the Ninth Circuit consider the *Sleekcraft* factors:

(1) the strength of the plaintiff's mark;

(2) relatedness of the goods;

(3) similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) likely degree of purchaser care;

(7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product lines.

*Wendt*, 125 F.3d at 812 (applying *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)). This list of factors is not exhaustive and is not intended to be applied as a "mechanistic formula." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (citations and internal marks omitted), *cert. dismissed, Penguin Books USA, Inc. v. Dr. Seuss Enterprises*, —— U.S. ——, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997). "Other variables may come into play depending on the particular facts presented." *Id.* As the nature of the factors makes clear, the " 'likelihood of confusion' standard is predominantly factual in nature." *Id.*

■ Defendants argue no consumer would reasonably believe that the Franklin Mint's advertisements and products derived from or were authorized by Princess Diana, her Estate or the Fund. Similar arguments have met with mixed success in other celebri-

ty endorsement cases. In *Wendt*, the Ninth Circuit held that where a jury could reasonably conclude that most factors weigh in a plaintiff's favor, summary judgment on the issue of likelihood of confusion was inappropriate. *Id.; see also Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 413 (9th Cir. 1996) (holding Lanham Act claim based on GM's use of plaintiff's former name, Lew Alcindor, should go to jury). On the other hand, likelihood of confusion may be resolved as a matter of law on summary judgment where "the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir.1990) (holding commercial use of photographs of Babe Ruth did not indicate origin or make representation of sponsorship and granting summary judgment for defendants where plaintiff devisees essentially asserted trademark in Babe Ruth's image and likeness) (citations omitted); *see also, Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833–34 (6th Cir.1983) (affirming district court conclusion, after bench trial, that mark "Here's Johnny" was not so strong that its use for other goods should be foreclosed).[14]

 Regardless of the test to be applied at summary judgment, whether defendants' use of Princess Diana's name and likeness is likely to cause confusion as to the origin, sponsorship or approval of the Franklin Mint's goods by Princess Diana, her Estate or the Fund cannot be resolved on a motion to dismiss. Plaintiffs allege that defendants are falsely and misleadingly implying an endorsement, association or affiliation with Princess Diana, her Estate or the Fund by using Princess Diana's name and likeness, characterizing purchase of Franklin Mint products as a way to commemorate Princess Diana, referring to Princess Diana's charitable activities, and making misleading statements about the Franklin Mint's charitable giving in tribute to Princess Diana. In light of these allegations, the issue of likelihood of confusion cannot be resolved based on the pleadings.

 Raising a more complicated and novel question, defendants next assert that because British law governs the existence of a right of publicity, Princess Diana's name and likeness are in the public domain, and plaintiffs cannot state a claim for false endorsement based solely on allegations that defendants used her name and likeness. Hypothetically modifying the facts presented in *Waits*, defense counsel suggested at oral argument that if Waits' voice had been in the public domain, the Ninth Circuit would not have concluded that a claim for false endorsement based on Frito–Lay's use of a singer mimicking Waits' voice in advertisements was cognizable under § 43(a). *See Waits*, 978 F.2d at 1108–1111 (upholding jury verdict on § 43(a) claim against Frito–Lay, Inc.). Instead, counsel contends, where relevant aspects or markers of the celebrity's persona are in the public domain, plaintiffs must allege some confusing or misleading representation regarding endorsement beyond mere use of those aspects of the celebrity's persona.

Distilled to its essence, defendants assert that one cannot state a claim for false endorsement under the Lanham Act unless one retains publicity rights in the celebrity's persona. In light of the Court's ruling that plaintiffs cannot state a claim for infringement of a right of publicity under California Civil Code § 990 because British law applies to determine whether such a right is part of the Estate, and because Britain does not recognize a post-mortem right of publicity, defendants appear to be correct that Princess Diana's persona is "in the public domain" to the extent that the absence of a right of publicity relinquishes the celebrity persona to the public domain.

The absence of a right of publicity, however, does not necessarily confer upon the public a general right to use the celebrity's persona. Thus, while California law might not provide a right of publicity, the absence of that right does not, in and of itself, establish that plaintiffs cannot state a claim under federal law. Defendants have not suggested

---

14. In *Carson*, the district court found that although the defendant had plainly intended to capitalize on the phrase "Here's Johnny," there was little evidence of actual confusion, defendant had not intended to deceive the public into believing Carson was associated with the product, and there was no evidence that the use damaged Carson. 698 F.2d at 833–34.

that British law applies if it conflicts with protections provided under the Lanham Act. Consequently, neither the absence of a state law right of publicity nor the fact that Princess Diana's name and likeness may well be "in the public domain" in Britain constitutes a defense to a cognizable claim under § 43(a) of the Lanham Act.

One final issue presents itself with respect to plaintiffs' First Claim for relief. Plaintiffs counsel clarified at oral argument that their § 43(a) false designation of origin and false endorsement claim is based not on the fame of the Estate or the Fund, but on the value of Princess Diana's persona, which plaintiffs contend passed to her Estate. While it is well-established that a trademark is a transferrable property right, *see* McCarthy on Trademarks, 2:14 at 2–32 ("As a 'property right,' marks can be alienated like any piece of property."), neither the availability nor the parameters of a false endorsement claim brought by the estate of a celebrity have been established.

■ Defendants do not argue directly that a celebrity mark is not a descendible right under § 43(a). They assert, however, that a false endorsement claim brought by the Estate and the Fund must be based on allegations that defendants' advertisements and products falsely suggest the plaintiffs' endorsement, not Princess Diana's endorsement, and that the Estate and the Fund must therefore allege and establish that they are famous in their own right. Neither party cites any authority on this point; nor do the parties present reasoned arguments based on other areas of the law or policy considerations.

At the outset, it appears to the Court that one could theoretically assert a claim for false endorsement by a deceased celebrity (e.g., advertising might falsely suggest a particular product was endorsed by the celebrity before his or her death), and that plaintiffs have adequately alleged that defendants' advertising and products are likely to falsely suggest Princess Diana's endorsement of defendants' products. Nonetheless, it seems unlikely that the public would be confused as to whether Princess Diana endorsed the Franklin Mint's products in light of her premature and unexpected death. Presumably recognizing the fragility of such a claim, plaintiffs focus almost exclusively on their contention that defendants are falsely implying that plaintiffs endorse defendants' products.

■ With respect to plaintiffs' claim that defendants' use of Princess Diana's name and likeness falsely suggests plaintiffs' endorsement, the real question is not, as defendants would have it, whether § 43(a) protects the rights of devisees of a deceased celebrity, but whether use of a particular deceased celebrity's persona is likely to cause confusion "as to the origin, sponsorship, or approval of [the defendants'] goods, services, or commercial activities by *another person* [,]" here, the Estate or the Fund. 15 U.S.C. § 1125(a) (emphasis added). By using the term "another person," Congress selected language broad enough to encompass a claim by a deceased celebrity's Estate or by any celebrity's assignee.[15] The provision that any person likely to be damaged may bring a claim under § 43(a) is similarly expansive and provides another indication of Congressional intent to

15. In fact, a number of courts have applied § 43(a) to claims brought by an estate or assignees of a deceased celebrity. *See Estate of Presley v. Russen,* 513 F.Supp. 1339, 1376 (D.N.J.1981) (concluding facts supporting finding of likelihood of success regarding likelihood of confusion also supported § 43(a) claims brought by Elvis Presley's estate); *Hicks v. Casablanca Records,* 464 F.Supp. 426, 433 (S.D.N.Y.1978) (assuming without comment that estate and assignees of Agatha Christie could bring § 43(a) claim but dismissing the false endorsement claim because there was no likelihood of confusion); *Cheever v. Academy Chicago, Ltd.,* 690 F.Supp. 281, 288 (S.D.N.Y. 1988) (noting no apparent impediment to author John Cheever's survivors' § 43(a) claims and

commenting that potential financial motive would not undermine claim based on literary reputation of deceased); *Museum Boutique Intercontinental, Ltd. v. Picasso,* 880 F.Supp. 153, 166 (referring to unpublished related case involving Lanham Act false endorsement claims brought by Picasso heirs and estate; *but see Robles v. Deutsch Advertising, Inc.,* 1997 WL 266976 (S.D.N.Y.1997) (affirming discovery order denying access to defendants' financial information because defendants' belief that plaintiff-actor was deceased or had signed away his rights to film meant defendants' use of film clips was not in bad faith or done with malice that would support award of profits and attorneys' fees on § 43(a) false endorsement claim).

protect any person injured by a false suggestion of celebrity endorsement, not just the celebrity.

■ When read in conjunction with the relevant statutory language, the Ninth Circuit's discussion of standing in *Waits* also supports the conclusion that the estate of a deceased celebrity has standing to bring a claim for false endorsement based on use of the celebrity's persona. A person has standing to assert a claim under § 43(a) "where the interest asserted by the plaintiff is a commercial interest protected by the Lanham Act." *Waits*, 978 F.2d at 1108. Here, plaintiffs assert a commercial interest in preventing unauthorized use of Princess Diana's persona because such use will allegedly create confusion concerning plaintiffs' endorsement of the Franklin Mint's products. The fact that plaintiffs ultimately intend to use their profits for charitable purposes is immaterial; they assert a commercial interest within the meaning of § 43(a). In short, plaintiffs satisfactorily allege a false endorsement claim based on defendants' use of Princess Diana's persona.

■ Defendants argue, in the alternative, that even if the Estate and the Fund are entitled to assert a claim under § 43(a) based on Princess Diana's famous persona rather than on their own fame, the "Court should find that the mere depiction of a deceased celebrity does not imply the celebrity's heirs' endorsement." Reply at 10. Of course, plaintiffs allege more than the mere depiction of Princess Diana. Plaintiffs allege that the Fund was established by executors of the Estate to ensure that donations in honor of Princess Diana are used to carry on her charitable works and that use of her name and likeness, in conjunction with references to Princess Diana's charitable activity, tributes to Princess Diana, and the Franklin Mint's charitable giving in Princess Diana's name, create a likelihood of confusion concerning Princess Diana, the Estate and/or the Fund's association with or sponsorship of

the Franklin Mint and its products. Because likelihood of confusion involves a factual inquiry, defendants' motion to dismiss the First Claim for relief is denied.

### 4. Second Claim: Federal Trademark Dilution

■ Defendants also move to dismiss plaintiffs' Second Claim for relief from trademark dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125. Plaintiffs premise their dilution claim on § 1125(c)(1), which provides that

> the owner of a famous mark shall be entitled, subject to principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark[.]

15 U.S.C. § 1125(c)(1). Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127; *see also Panavision Int'l L.P. v. Toeppen*, 945 F.Supp. 1296, 1301 (C.D.Cal.1996) ("Trademark dilution laws protect 'distinctive' or 'famous' trademarks from certain unauthorized uses of the marks regardless of a showing of competition or likelihood of confusion."), *aff'd, Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir.1998).[16] To prove a violation of the Federal Trademark Dilution Act, a plaintiff must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the

---

**16.** Traditionally, dilution has been found where the defendant's conduct either tarnishes or blurs the mark, but dilution is not limited to tarnishment and blurring. *Panavision Int'l*, 141 F.3d at 1326. When a famous mark is linked to products of lesser quality or portrayed in an unwholesome manner, the mark is tarnished. *Panavision*

*Int'l*, 945 F.Supp. at 1304 (citations omitted). " 'Blurring' involves a 'whittling away' of the selling power and value of a trademark by unauthorized use of the mark. Examples of blurring would be 'Pepsi' in-line skates or 'Microsoft' lipstick." *Id.*

mark to identify and distinguish goods and services. *Panavision*, 141 F.3d at 1324.

The Federal Trademark Dilution Act lists eight non-exclusive factors a court may consider in determining whether a mark is distinctive and famous. The statutory factors are:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

■ In general, personal names are not inherently distinctive marks and can be protected as trade or service marks only where they have acquired secondary meaning. McCarthy on Trademarks, § 13.2 at 13–3.[17]

Secondary meaning grows out of long association of the name with the business, and thereby becomes the name of the business as such; is acquired when the name and business become synonymous in the public

mind; and submerges the primary meaning of the name as a word identifying the person, in favor of its meaning as a word identifying that business.

*Id.*, § 13.2 at 13–5 (quoting *Visser v. Macres*, 214 Cal.App.2d 249, 29 Cal.Rptr. 367 (4th Dist.1963)). Thus, to state a claim under the Federal Trademark Dilution Act for service mark infringement, a plaintiff must allege that the personal name asserted as a mark has acquired secondary meaning such that the name is synonymous in the public mind with the service provided by the plaintiff. "Implicit in the concept of a trade mark 'is a requirement that there be direct association between the mark . . . and the services specified in the application, i.e., that it be used in such a manner that it would be readily perceived as identifying such services.'" *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 906–07 (9th Cir.1995). In *SRF Church*, the Ninth Circuit affirmed a trial court decision granting summary judgment for defendant where plaintiff failed to raise a genuine issue of fact concerning whether plaintiff had used the name of Paramahansa Yogananda, the guru followed by both plaintiff and defendant churches, in a service mark manner. *Id.* It follows that to state a claim for service mark infringement, one must allege that the personal name has been used as a service mark.

■ Here, plaintiffs allege that "Princess Diana's name and image have been intensively and extensively advertised and promoted throughout the world in connection with her charitable activities, and as a result of this advertising and promotion, the name and image have come to mean and are recognized in world wide trading areas and channels of

---

**17.** According to McCarthy,

> While the key to the right of publicity is the commercial value of a human identity, the key to the law of trademarks is the use of a word or symbol in such a way that it identifies and distinguishes a *commercial source*. Thus, while a trademark identifies and distinguishes a commercial source of goods and services, the 'persona' protected by a right of publicity law identifies one human being.

McCarthy at § 28:8 (emphasis in original). This distinction raises interesting issues in light of the Ninth Circuit rule protecting a celebrity's persona as a "mark" for purposes of a false endorsement claim under § 43(a). *See Wendt*, 125 F.3d

at 811. If McCarthy's analysis is correct, and the requirement that a plaintiff establish secondary meaning to prevail on a claim for trademark dilution suggests that it is, then either the "mark" protected under § 1125(a) is different from the mark protected under § 1125(c), or a celebrity may also protect his or her persona from trademark dilution under § 1125(c). Section 1125 does not use the term "mark" to define the rights protected under subsection (a), so it may well be that two different tests apply. Nonetheless, it at least linguistically awkward to assign different meanings to the word "mark" when used in conjuction with the two applicable subsections of § 43 of the Lanham Act.

trade as distinctive marks which identify the source of the charitable activities of Diana, Princess of Wales." FAC ¶ 24. Moreover, plaintiffs specifically allege that their asserted marks are "famous and distinctive within the meaning of 15 U.S.C. § 1125(c)(1) and 1127." FAC ¶ 25. Plaintiffs need not, as defense counsel asserted at oral argument, "use the magic words 'secondary meaning' " to state a claim for trademark dilution.

▪ The Ninth Circuit has explicitly held that well-known authors and characters can have such established primary identifications that no secondary meaning is possible, at least in the field from which the person's fame derives.[18] *Chamberlain v. Columbia Pictures Corp.*, 186 F.2d 923, 925 (9th Cir. 1951). In *Chamberlain*, Mark Twain's heirs attempted to prevent the use of his name on a motion picture loosely drawn from a Twain story. *Id.* The district court dismissed for failure to state a claim, and plaintiffs appealed. *Id.* at 923. The Circuit's analysis controls here and is worth citing at length:

> Appellants do not have a right to the exclusive use of the name 'Mark Twain.' It is not alleged that appellee is selling the story as appellants' story; their complaint is that the association of the name 'Mark Twain' with a 'corny' production injures appellants' chances to sell other works of

that eminent author by detracting from his fame as such. To our minds this is a nebulous, far-fetched conclusion. We could almost take judicial notice of the fact that the fame of 'Mark Twain' cannot be so easily marred. Of course we realize that a determination of the weight of evidence that might be produced is not our function here. We mention it merely to point up the weakness of the allegations made.... Appellants do not have a monopoly. They own only a portion of the extant works of Mark Twain. In order to entitle appellants to the relief sought it would be necessary for them to allege that they have an exclusive right to the use of the story in question ...

> We think the name Mark Twain is incapable of acquiring a secondary meaning in connection with literary property. The name Mark Twain, [from] a literary standpoint, indicates only the writings of Samuel L. Clemens, which is a primary meaning.

*Id.* at 925.

In a recent unpublished decision in a similar case, Judge Wilken of the Northern District of California held: "[a]ssuming that the mark HORATIO ALGER is descriptive as applied to an exercise to debunk the Horatio Alger myth, it is protectible only if it has acquired a secondary meaning." *Cano v. A*

---

**18.** Another line of authority suggests that "[w]idely recognized historical or famous names do not fall into the classical 'personal names' category at all." McCarthy on Trademarks, § 13:25 at 13–42. That rule is limited, however, to cases in which the historical or famous name at issue is used as a fanciful mark, so that the "the name is not descriptive of the quality or character of the article[.]" *Id.* Under the Restatement formulation, "[i]f a mark consists of the name of an historical figure or other noted person and is likely to be recognized as such by prospective purchasers, secondary meaning ordinarily will not be required." *Id.* at 13–43 (citing Restatement (Third) of Unfair Competition § 14, comment 3 (Tentative Draft No. 2 1990)). In other words, if the personal name is sufficiently famous and is used in such a way that purchasers will understand that the name is used arbitrarily as a mark rather than descriptively to suggest that the famous person is somehow involved in the sale of goods or services, it is unnecessary to establish secondary meaning. "No reasonable buyer would believe that Julius Caesar had something to do with CAESAR cigarettes or that Abraham Lincoln was selling LINCOLN insurance." *Id.* Put simply, where a per-

sonal name is used fancifully as a mark, the meaning is secondary by nature (i.e., not descriptive of the person) and there is no need to establish secondary meaning.

McCarthy suggests that the Ninth Circuit applied this rule when it found the long use of the name "Du Barry" on beauty products constituted a fanciful mark despite the existence of other uses of the name in the entertainment industry to describe the woman who historically bore the name and other uses in unrelated classes of products. *Du Barry of Hollywood, Inc. v. Richard Hudnut*, 323 F.2d 986, 988 (9th Cir.1963). The Ninth Circuit went on to conclude, however, that Hudnut's Du Barry line of products was well-established and that the name Du Barry had acquired a secondary meaning identifying the source of Hudnut's beauty products, salon and success school. *Id.* Consequently, to the extent an exception exists for the use of famous and historical names, the Ninth Circuit apparently requires proof of secondary meaning in one form or another. Plaintiffs concede as much and do not dispute that they must establish secondary meaning for their asserted marks to prevail on their Second Claim for relief.

*World of Difference Institute,* 1996 WL 371064 (N.D.Cal.1996). Following *Chamberlain,* Judge Wilken allowed plaintiff to amend the complaint, but commented that just as the name Mark Twain is incapable of acquiring secondary meaning in connection with literary property, the name Horatio Alger has a strong primary meaning referring to the author himself. *Id.* at * 18. Similarly, Diana, Princess of Wales has such a clear primary meaning as a description of the person herself that it seems unlikely that any secondary meaning could be acquired in her name, at least in the context of fund-raising for charitable services similar to those she was allegedly famous for endorsing. Nonetheless, whether Princess Diana's name has acquired secondary meaning indicative of the source of her charitable works is best resolved on a motion for summary judgment.

 Taking the allegations of the complaint as true, as we must on a motion to dismiss, the Court finds plaintiffs state a claim for trademark dilution under § 1125(c)(1) by alleging that (1) their marks, "Diana Princess of Wales" and "Diana Princess of Wales Memorial Fund," are famous;[19] (2) defendants are using the marks commercially; (3) defendants' use commenced after the mark became famous; and (4) defendants' use of the marks dilutes their quality by diminishing the capacity of the marks to identify and distinguish plaintiffs' charitable services. *See Panavision,* 141 F.3d at 1324; FAC ¶ 26. Consequently, defendants' motion to dismiss plaintiffs' Second Claim for relief is denied.

### 5. Fourth Claim: False Advertising

 To state a claim for false advertising under § 43(a) of the Lanham Act, a plaintiff must allege:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce;

and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997) (citations omitted). To establish falsity under § 43(a), a plaintiff must show either that the advertising was literally false or that it was literally true but likely to mislead or confuse consumers. *Id.* Where a statement is not literally false and is only misleading in context, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients is critical. *William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258 (9th Cir.1995). If a defendant intentionally misled consumers, the Court may presume consumers were in fact deceived, and defendant has the burden of demonstrating otherwise. *Id.* Public reaction is typically tested through the use of consumer surveys. *Southland Sod Farms,* 108 F.3d at 1140.

 Here, plaintiffs adequately allege that defendants' advertisements falsely imply plaintiffs' endorsement, Princess Diana's endorsement, and/or that defendants will donate proceeds to the Fund. *See* First Amended Complaint, ¶¶ 36, 38. Accordingly, defendants' motion to dismiss the Fourth Claim for relief is denied.

### 6. Fifth Claim: State Unfair Competition and False and Misleading Advertising

Finally, defendants move to dismiss plaintiffs' claims for violation of California Business & Professions Code §§ 17200 and 17500, et seq. Plaintiffs contend the public is and will continue to be confused by defendants' claim that proceeds from the sale of Franklin Mint commemorative items related to Princess Diana will go to "Diana's favorite charities." According to plaintiffs' allegations, such advertising creates confusion by

---

**19.** The Estate has allegedly filed applications for federal trademark registrations in various classes for "Diana Princess of Wales" and Diana Princess of Wales Memorial Fund" with priority dates of September 4 and September 11, 1997. *Id.,* ¶ 11.

implying that defendants will donate the profits to the Fund.

■ Under the California Unfair Business Practices Act ("UBPA"), unfair competition includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal. Bus. & Prof.Code § 17200. The statute also contains a provision prohibiting false advertising. Cal. Bus. & Prof. Code § 17500. Section 17500 bars dissemination of any statement regarding the sale of personal property "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.* Any violation of the false advertising law necessarily violates the unfair competition law. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995) (citing *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (1983)).

■ To state a claim under the UPBA, one need only show that "members of the public are likely to be deceived." *Id.* (citation omitted). A claim based on false or misleading advertising and unfair business practices "must be evaluated from the vantage of a reasonable consumer." *Id.* Here, plaintiffs state a claim under California law for false advertising and unfair business practices based on their allegations that defendants' advertisements misleadingly imply that the Franklin Mint products are endorsed by or affiliated with Princess Diana, her Estate or the Fund. In addition, plaintiffs satisfactorily allege that defendants advertisements misleadingly suggest proceeds will be donated to the Fund. Whether consumers have been or will be misled is a factual question that cannot be resolved on a motion to dismiss. Accordingly, defendants' motion to dismiss the Fifth Claim for relief is denied.

## B. Motion to Strike

■ Before filing a responsive pleading, a party may move to strike "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R.Civ.P. 12(f). " 'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded. [ ] 'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Fantasy Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993) (citations omitted), *rev'd on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). While motions to strike are typically disfavored, a motion is well-taken where "it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *LeDuc v. Kentucky Central Life Ins. Co.*, 814 F.Supp. 820, 830 (N.D.Cal.1992).

### 1. "Vultures Feeding on the Dead"

■ Defendants move to strike plaintiffs' allegation that defendants are "[l]ike vultures feeding on the dead." *See* First Amended Complaint, ¶ 1. This language is immaterial and impertinent as it has no bearing whatsoever on the legal issues presented. Princess Diana's death caused an emotional outpouring around the world. This action will undoubtedly continue to be the subject of media scrutiny, and there is no need to couch the material allegations of the First Amended Complaint in language that serves only to fan the flames in this already heated dispute. Defendants' motion to strike the allegation that they are "like vultures feeding on the dead" is granted, and the parties are cautioned to refrain from attempting to litigate their dispute in the media.

### 2. Damages

Defendants move to strike the damage claim pled in connection with Cal. Civ.Code § 990 because the person who registered as the claimant as successor-in-interest was allegedly an improper party. The motion is denied as moot in light of the Court's ruling on defendants' motion to dismiss the § 990 claim.

## C. Plaintiffs' Motion for Preliminary Injunction

### 1. Standard

■ In the Ninth Circuit, a party may obtain preliminary injunctive relief by satis-

fying one of two tests. The traditional test requires "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest[.]" *Johnson v. California State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir.1995). Under the so-called "alternative test," a party seeking a preliminary injunction must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994).

▆▆▆▆ Taken together, the two tests reflect "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir.1993) (citations and internal quotation marks omitted). Under either test, the moving party must show, as an irreducible minimum, that there is a fair chance of success on the merits. *Stanley,* 13 F.3d at 1319. Likewise, "[u]nder either formulation of the test, the party seeking the injunction must demonstrate that it will be exposed to some significant risk of irreparable injury." *Associated General Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir.1991). Finally, under either test courts consider, explicitly or implicitly, both the balance of hardships and whether the public interest militates in favor of injunctive relief.

### 2. Application

The Court has carefully considered all of the evidence submitted in conjunction with plaintiffs' motion for a preliminary injunction, as well as the parties' objections to evidence. The core question to be resolved with respect to plaintiffs' motion is whether plaintiffs have shown a fair chance of success on the merits with respect to their allegations that (1) defendants' advertisements create a likelihood of confusion as to the source of defendants' products, suggesting the endorsement of Princess Diana, her Estate or the Fund; (2) defendants' advertisements are literally or impliedly false for purposes of plaintiffs' false advertising claims; or (3) the alleged marks "Diana, Princess of Wales" and "Diana, Princess of Wales Memorial Fund" have acquired secondary meaning and defendants' advertisements and products dilute the value of those marks.

### a. Likelihood of Confusion: § 43(a) of the Lanham Act

▆▆▆▆ The Court articulated the standard for assessing likelihood of confusion in its ruling on defendants' motion to dismiss. In summary, that standard requires consideration of the *Sleekcraft* factors as part of the overall analysis of likelihood of confusion. *See Wendt,* 125 F.3d at 812 (applying *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979)). Defendants contend that the *Sleekcraft* factors do not apply here because plaintiffs have not established that they have a "mark" at all, let alone that Princess Diana's persona is their mark. As the Court explained above, however, § 43(a) permits a claim by anyone injured as a result of false endorsement or false advertising. Based on the record before the Court, it appears plaintiffs are likely to prevail with respect to their contention that the Estate includes any rights Princess Diana had under § 43(a) to protect her public persona against false implications that she endorsed defendants' products. Defendants' argument that plaintiffs have no "mark" is properly treated as a laches defense rather than as an a priori bar to plaintiffs' § 43(a) claim. Consequently, plaintiffs are free to assert that they hold the mark consisting of Princess Diana's persona for purposes of § 43(a), and consideration of the *Sleekcraft* factors is appropriate. Nonetheless, upon review of the relevant factors discussed below, the Court finds plaintiffs have not established that they have a fair chance of success on the merits on their false endorsement claim under § 43(a).

### 1. Strength of the Mark

▆▆▆▆ Princess Diana was undoubtedly one of the most celebrated individuals of the century. Ninth Circuit precedent establishes that where a celebrity plaintiff asserts a false endorsement claim, "the strength of the

mark refers to the level of recognition the celebrity enjoys." *Wendt,* 125 F.3d at 812 n. 1 (citing *White,* 971 F.2d at 1400). The plaintiffs here assert claims based on Princess Diana's fame rather than on their own level of recognition. Extrapolating from *Wendt* and *White,* the strength of the mark is based on Princess Diana's fame despite the fact that she is not asserting the claim herself. This factor strongly favors plaintiffs.

### 2. Strength of Association between Mark and Plaintiff

Where a celebrity's assignee or heir asserts a § 43(a) false endorsement claim, it seems appropriate to consider as a related factor the strength of the association between the celebrity and the party asserting the claim. Thus, if a new shoe company started marketing "Sky Jordans," one might expect Nike to assert a false endorsement claim based on Michael Jordan's fame and his association with and assignment of rights to Nike. By contrast, because Cameron Diaz does not appear in Frito Lay advertisements and is not associated in the public mind with Frito Lay products, an advertisement of Cameron Diaz eating a new brand of corn chips could not suggest Frito Lay's endorsement.

 The association between a deceased celebrity and his or her estate is automatic in the absence of prior uses of the celebrity's persona that create associations in the public mind between the celebrity and particular products or services. *Cf. Estate of Elvis,* 513 F.Supp. at 1367 (common law marks Elvis, Elvis Presley and a particular "Elvis Pose" "strongly identify Elvis Presley entertainment services and the source, although not necessarily known by name, of those services."). Widespread unauthorized use of a celebrity's persona during the celebrity's lifetime does not impinge on the association between a deceased celebrity and his or her estate to the same degree as a prior assignment resulting in a specific association of the celebrity with one product or service.

On the other hand, pervasive unauthorized use of a celebrity's persona will tend to dull the popular perception that use of that persona signifies an endorsement at all, weakening the initial automatic association between a celebrity and his or her estate. In extreme cases, use of the celebrity's persona may no longer "implicate the source-identification function that is the purpose of trademark," and may, therefore, constitute a fair use "because it does not imply sponsorship or endorsement by the trademark holder." *Cf. New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 306–08 (9th Cir.1992) (explaining nominative use of a mark lies outside strictures of trademark, noting problem that arises when mark also describes a person, and using Chicago Bulls as example). Nonetheless, while the public might not recognize initially the source of products or services authorized by a celebrity's estate, over time, the estate may be able to establish a strong association between use of the celebrity's persona and endorsement of the celebrity's estate despite widespread unauthorized use of the celebrity's persona during his or her lifetime.

 By contrast, unauthorized post-mortem use of a celebrity's persona is better treated as evidence relevant to a laches defense to be asserted against the estate than as an element of the strength of the association between the mark and the party asserting the false endorsement claim. Otherwise, the initial automatic association between a celebrity and his or her estate might be eviscerated where the celebrity's death results in a sudden flood of unauthorized commercial use.

Here, defendants argue that Princess Diana's celebrity mark is essentially blurred beyond recognition as a result of the widespread commercial use of her name and likeness over the past 17 years. The Court need not consider the effect of unauthorized commercial use of Princess Diana's name and likeness after her death, however, because such use goes to the defense of laches rather than to the strength of plaintiffs' association with her celebrity mark. On the record before the Court, it appears that while there was substantial unauthorized commercial use prior to the Princess' death, her death precipitated an explosion of unauthorized commercial products. As a result of the commercial exploitation during Princess Diana's lifetime, the automatic association arising at Princess Diana's death between the Estate

and products depicting the Princess is weakened, but not entirely dissolved. Consequently, this factor tips the balance only slightly in plaintiffs' favor, if at all.

### 3. Relatedness of Goods

■ The "goods" in a celebrity endorsement case "concern the reasons for or the source of the plaintiff's fame." *White,* 971 F.2d at 1400. Here, defendants' advertisements sell their products by drawing upon the core reasons for Princess Diana's fame: her status as a member of the Royal Family, her reputation as a trend-setter in the fashion world, and her work on behalf of charitable organizations. Consequently, this factor favors plaintiffs.[20]

### 4. Similarity of Marks

■ Defendants are using a mark identical to the celebrity mark claimed by plaintiffs. Nonetheless, "[t]he relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188, 201 (5th Cir.1998) (internal marks and citations omitted). On the record before the Court, plaintiffs have not presented sufficient evidence to suggest that use of Princess Diana's name and likeness indicates that prospective purchasers are likely to believe the Franklin Mint is somehow associated with the Estate or the Fund. This is particularly so in light of defendants' evidence that plaintiffs use a purple crest to signify that a product is authorized by Princess Diana's Estate or the Fund. This factor favors defendants.

### 5. Evidence of Confusion

While plaintiffs present some evidence of actual confusion, that evidence is outweighed by defendants' survey evidence and the presumption that plaintiffs' failure to conduct a survey indicates the results of such a survey would be unfavorable for plaintiffs.

■ "There are at least three types of proof of likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion;

and (3) an argument based on an inference arising from a judicial comparison of conflicting marks themselves and the context of their use in the marketplace. In a close case amounting to a tie, doubts are resolved in favor of the senior user[.]" *Dr. Seuss,* 109 F.3d at 1404. Here, the Court considers all three types of evidence.

■ First, defendants have presented the results of double-blind telephone survey of 403 randomly selected adults conducted by the Field Research Corporation. *See* Jay Decl., ¶ 1. In that survey, respondents were read the sentence "We have pledged a minimum of 1.5 million dollars worldwide to charity as a/in tribute to the beloved Princess Diana," and were then asked "What does this sentence mean to you?" and "When the sentence refers to charity does any particular charity or organization come to mind?" *Id.,* ¶ 2. Aggregating responses across both questions, only 6.9% of respondents said they thought money was being donated to "a/the Princess Diana fund; the Princess Diana trust fund; the Princess Diana organization; Diana or Princess Diana's/her charity." *Id.,* ¶ 3. "[S]urvey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent." *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 467 (4th Cir.1996) (holding 30–40% confusion between L'eggs and Leg Looks provided significant degree of actual confusion); *see also Visa Int'l Service Ass'n v. Eastern Financial Credit Union,* 24 U.S.P.Q.2d 1365, 1368, 1992 WL 138231 (9th Cir.1992) (6.7% confusion between marks insufficient to show actual confusion for purposes of preliminary injunction); *Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 358 (7th Cir.1983) (collecting cases and holding 7.6% confusion finding weighs against infringement). Consequently, defendants' survey suggests that there is little likelihood of confusion.

■ The value of defendants' survey is slightly diminished for two reasons. First, it is not clear from the record that the population surveyed is representative of the market for products depicting or referring to Princess Diana. Nonetheless, given the

---

**20.** Moreover, as evidenced by the parties' ongoing negotiations over the year following Princess Diana's death, plaintiffs plan to endorse products similar to those defendants now sell.

broad marketing techniques outlined in defendants' papers, the general adult population may well be a sufficient proxy for the relevant market. Moreover, "[t]he selection of an inappropriate universe affects the weight of the resulting survey data, not its admissibility.... Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which it was intended." McCarthy on Trademarks, § 32:162 at 32–201. In fact, a survey targeted at potential purchasers of Princess Diana memorabilia might well produce results even more favorable to defendants because people interested in products depicting Princess Diana will presumably be more likely to know about the Fund and distinguish products authorized by the Fund from those not connected with the Fund or the Estate. Consequently, even if defendants could have designed a survey better tailored to the appropriate universe of consumers, the Field survey is still of significant probative value.

Plaintiffs also contend the Field survey is of limited value because rather than showing respondents the Franklin Mint's advertisements to provide the relevant language in context, defendants conducted a telephone survey. According to McCarthy, "[t]he better view is that the closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has.... [Nonetheless,] [s]urveys taken at home in person or by telephone should not be discounted or denigrated, but accepted as probative evidence if properly conducted." McCarthy on Trademarks, § 32:163 at 32–204.

Here, the failure to obtain results based on the full advertisements slightly diminishes the weight accorded defendants' survey because seeing the words in context might increase a respondent's perception that the advertisements indicate Princess Diana, the Estate or the Fund's endorsement. On the other hand, although a survey that provides respondents with visual context for advertisements is preferable in some respects, "mall intercept" surveys, in which respondents are selected from the corridors of shopping malls in the relevant geographic areas, do not provide a random sample, making it risky to extrapolate from the results of the study to the broader population. *See id.,* § 32:164 at 32–304 (benefit of probability sample is that persons selected reflect make-up of universe); *see also Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.,* 875 F.Supp. 966, 981 (E.D.N.Y.1994) (random probability sampling entitled to more weight than face-to-face mall intercept). The fact that defendants' survey is based on a random sample makes it more reliable than a mall intercept survey, at least insofar as the results are not misleading because of the absence of visual context. While the Court might wish to have the benefit of each type of survey, defendants had little time initially to respond to the motion for a preliminary injunction. With all of the foregoing caveats, the survey ultimately provides useful evidence regarding whether plaintiffs have a fair chance of success in proving that defendants' advertisements are likely to confuse consumers as to the source or endorsement by plaintiffs of defendants' products.

By contrast, plaintiffs have not submitted survey results, despite the opportunity to conduct such research both before seeking injunctive relief and before the continued hearing on the pending motion. Survey evidence is not required to establish likelihood of confusion, but it is often the most persuasive evidence. *Cf. Committee for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814, 822 (9th Cir.1996) (so holding with respect to secondary meaning). Consequently, a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable. *See Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 583 (D.N.J.1985) (trademark owner's failure to run survey to support claim of likelihood of confusion may result in inference that survey would be unfavorable thereby resulting in denial of relief); *Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 475–76 (3d Cir. 1990) (jury could infer plaintiff's failure to conduct survey indicated plaintiff's belief that survey would be unfavorable); *see also Marketing Displays, Inc. v. Traffix Devices, Inc.,* 971 F.Supp. 262, 267–68 (E.D.Mich.1997) (plaintiff's failure to produce survey evidence of secondary meaning favors defendant).

Here, plaintiffs had ample opportunity to conduct their own survey, and their failure to do so undermines their position that the advertisements at issue are likely to confuse consumers as to plaintiffs' endorsement.

 Plaintiffs present three declarations of individuals who were actually confused by the advertisements. While these declarations favor plaintiffs and indicate at least some level of confusion exists among consumers, on the record before the Court, these declarations are not sufficient to tip the balance in favor of plaintiffs. "Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion." McCarthy on Trademarks, § 23:13 at 23–35. Nonetheless,

> [j]ust as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion. To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.

*Id.*, § 23:14 at 23–49 (quoting *International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196 (1st Cir.1996)). Although the declarations of Sandra Lynn Arkanoff, Karen Menone and Constance M. White provide evidence of actual confusion, they do not represent an adequate sample of the relevant universe. This is particularly so in light of the widespread advertising and sales of the Franklin Mint's Princess Diana products.

Finally, the Court's own consideration of defendants' use of Princess Diana's name and likeness in the context of the Franklin Mint's advertisements promising donations to Princess Diana's favorite charities suggests, on the record before the Court, that plaintiffs have less than a fair chance of prevailing on the merits with respect to their claims that the advertisements falsely suggest Princess Diana or the plaintiffs' endorsement or that proceeds will be donated to the Fund rather than directly to some of Princess Diana's favorite charities.

Taking all of the evidence of confusion together, this factor tips decidedly in defendants' favor.

### 6. Marketing Channels

Plaintiffs present no evidence that they have used marketing channels similar to those used by defendants. Evidence of newspaper articles about Princess Diana in similar marketing channels is irrelevant. Consequently, this factor favors defendants.

### 7. Likely Degree of Purchaser Care

In general, "consumers are not likely to be particularly careful in determining who endorses [a product], making confusion as to their endorsement more likely." *White*, 971 F.2d at 1400. That general rule is less applicable here, however, for several reasons. First, the Franklin Mint's products are not inexpensive goods purchased in the grocery or drug store. The Diana, Princess of Wales Porcelain Portrait Doll, for example, costs $195, while the Princess Diana Tiara Ring costs $595. Cameron Decl., Exh. T. Although it is significantly less expensive, the Princess Diana Tribute Plate still sells for $29.95. *Id.*, Exh. PP. More importantly, the publicity surrounding the Fund and its endorsements, as evidenced by the numerous articles submitted in conjunction with the pending motion, is likely to increase the care consumers take in considering whether a product is endorsed by the plaintiffs. This is particularly so given the proposed Diana Spencer Fund set up by Princess Diana's brother. In light of the debate surrounding the rapid commercialization of Princess Diana's identity, people interested in purchasing products depicting Princess Diana might well take more care than usual to ensure, if they so desire, that their purchase is sponsored by Princess Diana's Estate or by the Fund. Consequently, this factor slightly favors plaintiffs.

### 8. Defendants' Intent in Selecting Mark

Defendants' intent in selecting the mark is unclear. While defendants may have chosen to market Princess Diana products to capitalize on her celebrity, for the reasons discussed above, plaintiffs' evidence does not persuade the Court that defendants intended to suggest Princess Diana's endorsement or the

endorsement of the Estate or the Fund. Consequently, this factor favors defendants.

### 9. Likelihood of Expansion of Product Lines

Finally, the evidence suggests that both parties intend to expand their product lines, and that the product areas might well overlap. *See Dr. Seuss*, 109 F.3d at 1404; *Sleekcraft*, 599 F.2d 341. As a result, this factor favors plaintiffs.[21]

### 10. Balancing

Considering all of the factors together, the evidence before the Court is not sufficient to support a finding that plaintiffs have a fair chance of demonstrating the likelihood of confusion necessary for plaintiffs to succeed on the merits of their false endorsement claim. As a result, plaintiffs' motion for a preliminary injunction based on their First Claim for relief is properly denied. The Court need not consider the remaining elements of the test for a preliminary injunction because to obtain preliminary injunctive relief the moving party must show, as an irreducible minimum, that there is a fair chance of success on the merits. *See Stanley*, 13 F.3d at 1319. Likewise, the Court need not address the defense of laches at this juncture.

### b. False Advertising and Unfair Competition

Plaintiffs contend defendants' advertisements are misleading because they imply: (1) the Estate's endorsement; (2) the Fund's

endorsement; (3) Princess Diana's endorsement; and/or (4) that proceeds would be donated to the Fund. With respect to the false implications of endorsement, the Court's conclusion that plaintiffs have failed to establish a fair chance of success on their § 43(a) false endorsement claim applies with equal force to plaintiffs' false advertising claim under the Lanham Act and to plaintiffs' false advertising and unfair competition claims under state law. As to plaintiffs' contention that the advertisements falsely imply that proceeds will be donated to the Fund, neither the Court's reading of the advertisements nor the record before the Court supports plaintiffs' position, and plaintiffs' argument is not sufficient to support a preliminary injunction.

### c. Secondary Meaning: Trademark Dilution

Plaintiffs allege they own marks including "Diana, Princess of Wales" and "Diana, Princess of Wales Memorial Fund," but they do not allege ownership of any other specific marks. Instead, they assert that they own trademarks in a general "Princess Diana" mark and image, such that any commercial use of Princess Diana's name or image might dilute their alleged trademarks. For purposes of the pending motions, however, the Court only considers those marks alleged in the operative complaint.[22] Plaintiffs contend Princess Diana's name and image have acquired secondary meaning "as the source of charitable activities engaged in or promoted

---

21. Plaintiffs contend the Court should consider, as an additional factor, preliminary decisions of the United States Patent Office rejecting the Franklin Mint's trademark applications for marks such as "Diana, Forever a Princess" and "Diana, Angel of Mercy." *See* Cameron Decl., Exhs. FF–NN (Office Action notices refusing registration because marks falsely suggest a connection with the late Diana, Princess of Wales). The parties agree that such decisions are not binding, but plaintiffs argue the Court should give deference to the factual findings of the USPTO. *See Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 852–53 (2d Cir.1988) ("[T]he legal question in trademark registration proceedings—particularly those involving opposition on grounds of consumer confusion—is within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these

standards to the facts of the particular case[.]") (citations and internal marks omitted); *see also Mechanical Plastics Corp. v. Titan Technologies*, 823 F.Supp. 1137, 1149 (S.D.N.Y.1993), *aff'd*, 33 F.3d 50 (2d Cir.1994). The Court need not resolve the parties' dispute because even if the Court were to give deference to the Patent and Trademark Office Action notices and consider the preliminary findings as one factor in the analysis of likelihood of confusion, the outcome would be the same.

22. Nonetheless, the Court's analysis of whether plaintiffs have demonstrated that they have a fair chance of succeeding on the merits by showing that the alleged "Diana, Princess of Wales" mark has acquired secondary meaning is presumably applicable to all other names by which Princess Diana is or has been known.

by Princess Diana." To obtain injunctive relief, plaintiffs must establish at least a fair chance of success on the merits of their claim for trademark dilution by establishing that (1) the mark is famous; (2) defendants are using the mark commercially; (3) defendants' use began after the mark became famous; and (4) defendants' use dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services. *See Panavision,* 141 F.3d at 1324. Plaintiffs fail on the first prong.

Plaintiffs have not shown that they have a fair chance of succeeding on the merits of their claim that the personal name asserted as a mark, "Diana, Princess of Wales," has acquired secondary meaning such that the name is synonymous in the public mind with the service provided by the plaintiff, namely charitable activities. In fact, as the Court noted in its ruling on defendants' motion to dismiss, "Diana, Princess of Wales" has such a clear primary meaning as a description of the person herself that it seems unlikely that her name could acquire secondary meaning, at least in the context of fund-raising for charitable services similar to those she was allegedly famous for endorsing. *See Chamberlain,* 186 F.2d at 925. Princess Diana's name is directly associated with her person, her role as a member of the Royal Family, and the events of her life and death, including her charitable activities. The evidence before the Court does not suggest that plaintiffs have a fair chance of showing that Princess Diana's name is so directly associated with charitable services that use of her name is "readily perceived as identifying such services." *See Self–Realization Fellowship Church,* 59 F.3d at 906–07. Nor have plaintiffs presented evidence that the primary meaning of "Diana, Princess of Wales" as words identifying the person have been submerged in favor of the asserted secondary meaning identifying Princess Diana's charitable activities. *See* McCarthy, *Rights of Publicity and Privacy,* § 13.2 at 13–5 (quoting *Visser v. Macres,* 214 Cal.App.2d 249, 29 Cal.Rptr. 367 (4th Dist.1963)).

The Federal Trademark Dilution Act lists eight non-exclusive factors a court may consider in determining whether a mark is distinctive and famous. Application of those factors on the record before the Court indicates that plaintiffs cannot establish the requisite secondary meaning. First and foremost, as the Court explains in the preceding paragraph, the asserted mark does not appear to be distinctiveness except with respect to its primary meaning. Consideration of the remaining factors also supports denial of plaintiffs' motion: plaintiffs present little evidence that Princess Diana used her name as a mark to denote the source of her charitable activities for any significant duration or to a significant extent; plaintiffs present no evidence suggesting that the duration and extent of advertising and publicity of the mark were significant; plaintiffs' evidence cannot establish the geographical extent of the trading area in which Princess Diana's name has been used as a mark because there is no convincing evidence that her name has ever been used as a mark to indicate her charitable activities; plaintiffs assert that the mark has been used in particular channels of trade, namely charitable channels; plaintiffs provide virtually no evidence that the mark is recognized as a mark in charitable channels of trade or in the commercial channels utilized by the defendants; plaintiffs fail to present evidence that the nature and extent of use of the same or similar marks by third parties is limited; and, finally, Princess Diana's name has not been registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. *See* 15 U.S.C. § 1125(c)(1).

In short, it does not appear from the record before the Court that plaintiffs have a fair chance of establishing that they own a famous mark in the name and title "Diana, Princess of Wales" let alone in any other formulation of Princess Diana's name.

Plaintiffs also contend they are entitled to injunctive relief based on defendants' alleged infringement of their mark "Diana, Princess of Wales Memorial Fund." With respect to this mark, the Court need not consider whether the mark is famous because plaintiffs have failed to show that they have a fair chance of proving on the merits that defendants have commercially used the "Diana, Princess of Wales Memorial Fund" mark. None of plaintiffs evidence indicates that de-

fendants have used that mark at all. Consequently, with respect to the "Diana, Princess of Wales Memorial Fund" mark, plaintiffs have failed to establish a fair chance of success on the second prong of the test for trademark dilution. For the foregoing reasons, plaintiffs' motion for a preliminary injunction based on their Second Claim for relief is properly denied.

## IV.

### Conclusion

For the foregoing reasons, defendants' motion to dismiss for failure to state a claim is **GRANTED** with respect to plaintiffs' First Claim for relief under California Civil Code § 990 and **DENIED** in all other respects. Defendants' motion to strike inflammatory language in the First Amended Complaint is **GRANTED,** and defendants' motion to strike plaintiffs' claim for damages based on California Civil Code § 990 is **DENIED** as moot.

With respect to plaintiffs motion for a preliminary injunction, plaintiffs have failed to demonstrate a fair chance of success on the merits with respect to any of their remaining claims that (1) defendants' products and advertising create an appreciable risk of consumer confusion regarding the source of the goods or the plaintiffs' endorsement; (2) their asserted service marks have acquired secondary meaning entitling them to exclusive use of "Diana, Princess of Wales" and "Diana, Princess of Wales Memorial Fund;" or (3) defendants' advertising is false and misleading. Consequently, plaintiffs have not satisfied the requirements for preliminary injunctive relief, and the motion is **DENIED.**

**IT IS SO ORDERED**