**Susan Nicholson HOFHEINZ, Plaintiff,**

v.

**AMC PRODUCTIONS, INC., et ano., Defendants.**

**No. CV–00–5827(CPS).**

United States District Court, E.D. New York.

Jan. 2, 2001.

Order Amending Memorandum Jan. 11, 2001.

Gregory A. Sioris, New York City, for Plaintiff.

James W. Dabney, Pennie & Edmonds, New York City, for Defendant.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

Plaintiff Susan Nicholson Hofheinz moves by order to show cause signed November 1, 2000, for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure against defendants, AMC Productions, Inc. and Rainbow Media Holdings, Inc. alleging that defendants have (1) infringed plaintiff's copyrighted works in violation of the Copyright Act of 1976 (the "Act"), 17 U.S.C. §§ 101 *et seq.*,[1] (2) infringed plaintiff's

---

1. Specifically, plaintiff claims that defendants violated plaintiff's copyrights when defendants (1) exhibited the documentary film "It Conquered Hollywood! The Story of American International Pictures" in theaters without a license to exhibit the film in such a forum, (2) used models of plaintiff's copyrighted *Beulah* and *Saucerman* images contained in "It Conquered the World" and "Invasion of the Saucerman" respectively in the documentary, (3) used scenes from "The Amazing Colossal Man" in the documentary,

trademarks by falsely designating the origins of plaintiff's copyrighted works in violation of the Lanham Act, 15 U.S.C. § 1125(a), (3) breached the parties' March 23, 1999 agreement, (4) engaged in unfair competition, and (5) used the name, photographic image, or other likeness of the late James Nicholson in violation of California's publicity rights statute, Section 3344.1 of the Civil Code of the State of California.[2]

For the reasons set forth below, plaintiff's application for a preliminary injunction is denied. What follows sets forth the findings of fact and conclusions of law on which the decision denying a preliminary injunction is based, as required by Rule 65 of the Federal Rules of Civil Procedure.

## BACKGROUND

The following facts are taken from the submissions of the parties in connection with the instant application. Since the relevant facts are undisputed, no evidentiary hearing is required. *See Brown v. Giuliani,* 158 F.R.D. 251, 254 (E.D.N.Y. 1994).

Plaintiff is the widow of the late James Nicholson, one of the principals responsible for many of the motion pictures produced by American International Pictures ("AIP") during most of the company's existence. From 1954 through 1980, AIP released more than five hundred motion picture films. AIP's films helped establish what are known as the monster and teenage motion picture genres. Plaintiff holds the copyrights to a number of her late husband's motion pictures, six of which are at issue here.[3] Plaintiff resides in Palm Desert, California.

Defendant AMC Productions, Inc. is the subsidiary of American Movie Classics Company ("AMCC"), a cable television programming service and acts as AMCC's licensing arm. AMCC is currently accessible to over sixty-five million United States domestic households.

In February 1999, plaintiff met with Nancy McKenna, vice president of Production for AMCC, to discuss AMCC's desire to produce a documentary about AIP. On March 23, 1999, plaintiff sent defendants a written contract proposal (the "March 23, 1999 proposal"), offering defendants the right to use six, 59–second clips from AIP motion pictures in which plaintiff owns copyrights to enable defendants to produce "It Conquered the World! The Story of American International Pictures" (the "Documentary"), a documentary about AIP and of its two principals, Sam Arkoff and James Nicholson. The original proposal offered defendants the rights to ex-

---

(4) used still photographic images of the late James Nicholson in the documentary, and (5) exhibited unpublished copyrighted images from a poster advertising the movie "Apache Women" in the documentary.

2. Section 3344.1 states in pertinent part that: Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, ... without prior consent from the person or persons specified in subdivision (c), shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this

section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by the injured party or parties, as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.

3. The movies at issue are "I was a Teenage Frankenstein," "I Was a Teenage Werewolf," "The Amazing Colossal Man," "The Invasion of the Saucerman," "It Conquered the World," and "Apache Women."

hibit the film clips in the NTSC video format (domestic cable). The films originally included in the March 23, 1999 proposal were "I Was a Teenage Werewolf," "I Was a Teenage Frankenstein," "The Amazing Colossal Man," "Naked Paradise/ Thunder Over Hawaii," "The Invasion of the Saucerman," and "It Conquered the World." Subsequent to defendants' receipt of the March 23, 1999 proposal, defendant requested and plaintiff agreed to an alteration of the proposal, memorialized in a handwritten "addendum." The addendum provides that, in lieu of a clip from "Naked Paradise/ Thunder Over Hawaii," defendants will include a clip of equal length from "Apache Women," and that in lieu of a clip from "The Amazing Colossal Man," defendants will include a clip of up to two minutes in length from "It Conquered the World." On July 9, 1999, the parties signed the March 23, 1999 proposal with the handwritten addendum included therein, forming the original licensing agreement (the "licensing agreement"). The agreement states that "all matters or issues collateral hereto shall be governed by the laws of the State of California." Plaintiff granted the license in exchange for $36,000 and deposited defendants' check for that amount on July 12, 1999.

In January 2000, John Fitzgerald, associate producer at Planet Grande Pictures, Inc., AMCC's production company, contacted plaintiff, explaining that he contemplated using photographs of Nicholson in the Documentary. In response, plaintiff sent Fitzgerald approximately twenty photographs of Nicholson. Fitzgerald later returned the photos to plaintiff without comment. Plaintiff states that she assumed that AMC did not intend to use any of the photos in the Documentary since Fitzgerald did not ask her to give permission to do so.

In May 2000, defendants decided the quality of the Documentary made it worthy of consideration of the Academy of Motion Picture Arts and Sciences' (the "Academy") award for the year's best documentary. In June 2000, McKenna met with a consultant to determine what requirements had to be met in order to qualify the Documentary for award consideration and was told that, in order to be eligible for such an award, the Documentary had to have been exhibited in theaters for at least seven consecutive days during the year. In June 2000, the parties began discussing the terms of an additional license granting defendants the right to the show the Documentary in theaters.

On July 12, 2000, Fitzgerald sent plaintiff a list of the film clips used in the final production of the Documentary. The list included a short clip of "The Amazing Colossal Man." Plaintiff immediately notified McKenna that "The Amazing Colossal Man" was not covered by the licensing agreement.

Defendants asked plaintiff for permission to substitute the clip from "The Amazing Colossal Man" for a clip from "Apache Woman," which they had not used in the Documentary.

On August 17, 2000, Abigail Kende, president of Tele–Cinema, Inc., a company that does copyright and title clearances for AMCC, faxed plaintiff a written contract proposal modifying the licensing agreement by substituting "The Amazing Colossal Man" for "Apache Woman" and including the right to exhibit the Documentary in theaters for seven days. On August 28, 2000, Kende mailed plaintiff three hard copies of the modified licensing proposal on August 28, 2000. Kende also mailed plaintiff two checks for $2,500 and $5,500, representing plaintiff's licensing and consulting fees.

On August 29, 2000, plaintiff mailed her own contract proposal[4] to defendants. The cover letter to plaintiff's mailing stated:

Thank you for the package containing two checks totaling $8,000.00 and the draft of a new contract.

Rather than reinvent the wheel and leave open the question of which is the REAL agreement, I would prefer simply to sign a modification of the deal we already have in place. I believe this is Abigail's intention.

Please review the enclosed First Modification to Film Clip License Agreement. If it meets with your approval, please execute it and send copies to me for my signature.

I will hold the checks until we have full agreement on all these matters.

Plaintiff's First Modification to the Film Clip License Agreement stated in pertinent part:

Licensee agrees to exclude clips from the titles *Apache Woman* and *Naked Paradise/Thunder over Hawaii* from the Program. Licensor grants to Licensee the right to include in the Program a clip of 59 seconds or less from *The Amazing Colossal Man*, including but not limited to the "dream sequence" later used in the motion picture entitled *War of the Colossal Beast*.

Licensor further grants to Licensee an option ("the Option") to extend the License Agreement to encompass exhibition of The Program in a Single Limited Theatrical Run for Awards Consideration, such Single Limited Theatrical Run not to exceed eight days in length. Licensee shall pay to Licensor the amount of two thousand five hundred

($2,500.00) dollars (equal to the sum of five hundred ($500.00) per title) for the Option, which shall expire on December 31, 2000.

The agreement further provides that, in exchange for plaintiff's consulting services, defendants will pay plaintiff an additional $5,500, for a total of $8,000, and will grant plaintiff consulting credit in a "non-rolling, single fixed card or frame, using a font equal in size to that of other single card credits, placed at a position near the end of the Program immediately before that of the producer."

On September 12, 2000, defendants accepted plaintiff's modification, executed three copies of the "First Modification to Film Clip License Agreement," and mailed all three back to plaintiff Federal Express with a request that plaintiff return one fully executed copy for defendants' files. Plaintiff never signed any of the partially executed copies returned to her. Plaintiff argues that the modification sent to defendants was not an "offer" that could be accepted and that she was unwilling to enter a modification of their original licensing agreement until she had an opportunity to view the Documentary to assure that it otherwise complied with the parties' original licensing agreement.

From August 30, 2000, through September 12, 2000, plaintiff and McKenna had several conversations with respect to the screening of the Documentary that AMC planned to host at the Little Theater in Los Angeles on September 18, 2000. Plaintiff was one of the guests invited to the celebrity screening, and on September 4, 2000, plaintiff requested that defendants put an additional twenty guests on the screening's guest list.

---

4. Plaintiff maintains that her proposal was merely a draft and not an "offer" which could be accepted.

On September 14, 2000, a copy of the Documentary arrived at the hotel plaintiff was staying at in Las Vegas, Nevada. On September 15, 2000, plaintiff had an opportunity to view the tape which, according to plaintiff, revealed for the first time the various causes of action at issue in the instant lawsuit. On September 18, and September 20, 2000, plaintiff's counsel notified defendants' counsel of plaintiff's position that she had not agreed to the modification and that exhibiting the Documentary in a theater would be considered an infringement of plaintiff's copyrights.

On September 22, 2000, defendants ran an advertisement in *The Los Angeles Times* stating that the Documentary would be shown at the Laemmle Music Hall in Beverly Hills, California. The Documentary ran for seven days, from September 22, through September 27, 2000. Thirty four persons attended the theatrical exhibition over the course of the seven-day run, generating total revenues of $187.

On September 27, 2000, plaintiff, by order to show cause, applied for a temporary restraining order and preliminary injunction. On September 28, 2000,[5] I denied plaintiff's application for a temporary restraining order and signed an order, returnable on October 26, 2000, requiring defendants to show cause why a preliminary injunction should not issue pending the trial of this matter.

On October 20, 2000, plaintiff amended her complaint to include additional causes of action and new allegations of copyright infringement and, by motion made returnable the same day as the order to show cause, sought a preliminary injunction on the new causes of action alleged in the amended complaint. Defendants objected to plaintiff's motion, claiming that they

were not afforded adequate time to respond to plaintiff's motion. On October 26, 2000, the Court adjourned the return date of the original order to show cause to November 20, 2000 and on November 1, 2000, issued an order returnable November 20, 2000, requiring defendants to show cause why a preliminary injunction should not issue pending the trial of the causes of action contained in plaintiff's amended complaint. The parties subsequently stipulated to an adjournment of the order to show cause to December 18, 2000.

## DISCUSSION

Section 502 of the Copyright Act, 17 U.S.C. § 502, provides that applications to enjoin infringing conduct shall be governed by Rule 65 of the Federal Rules of Civil Procedure. Under Rule 65, a preliminary injunction is appropriate if the moving party demonstrates "(a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997); *Wainright Secs., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977).

### *Irreparable Harm*

The showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction," *Bell & Howell Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983), and the movant must show that injury is likely before the other requirements for an injunction will be considered. Irreparable harm must be shown to be "likely and

---

**5.** Plaintiff did not notify her adversary of her application or state why she could not do so. Accordingly, argument on the application was put over to the following day when both sides appeared.

imminent, not remote and speculative," and the injury must be such that it cannot be fully remedied by monetary damages. *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995); *see also JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990) (holding that "possibility" of harm is insufficient).

In copyright infringement cases, once a prima facie case of copyright infringement is established, the allegations of irreparable injury need not be very detailed because such injury is generally presumed. *See ABKCO Music, Inc. v. Stellar Records,* 96 F.3d 60, 64 (2d Cir.1996) (noting that "when a copyright plaintiff makes out a prima facie showing of infringement, irreparable harm may be presumed"); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985); *Wainright Secs.,* 558 F.2d at 94. To establish a prima facie case of copyright infringement, plaintiff must establish (1) ownership of a valid copyright, and (2) that defendants have engaged in unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Act. *See Hasbro Bradley,* 780 F.2d at 192 (citations omitted); *Sandoval v. New Line Cinema Corp.,* 973 F.Supp. 409, 412 (S.D.N.Y.1997). Among the exclusive rights afforded copyright holders is the right to reproduce and publicly display their copyrighted work. *See* 29 U.S.C. § 106(1) and (5).

Plaintiff fails to point to any tangible, imminent, irreparable harm to meet her burden with respect to her contract, unfair competition, and California statutory action. She relies on the presumption of irreparable harm that follows when a movant establishes a prima facie case of copyright infringement. Defendants argue

that plaintiff has failed to establish irreparable harm because plaintiff has failed to allege any injury not fully compensable by monetary damages. In addition, defendants argue that the equities of the case favor denying plaintiff's application because of the irreparable injury defendants would endure if the Court were to issue a preliminary injunction in this matter.[6]

Here, plaintiff's copyrights are not in dispute, and I assume that they are valid. The question remains, however, whether the acts alleged by the plaintiff amount to unauthorized copying. In addition to alleging that defendants unlawfully exhibited the Documentary in theaters, plaintiff's amended complaint alleges additional claims of copyright infringement, including a claim that defendants improperly exhibited fifteen seconds of copyrighted material from "The Amazing Colossal Man," thirty-seven seconds of still photographs of Nicholson bearing copyright notices, twenty-one seconds of plaintiff's copyrighted "Apache Women" poster, and forty-four seconds of monster character models.

I assume for purposes of this application that plaintiff has established a prima facie case of copyright infringement entitling her to a presumption of irreparable harm with respect to plaintiff's copyright infringement claims. I conclude that plaintiff has not established irreparable harm with respect to any other claims in her complaint or preliminary injunction application.

█ In order to prove a violation of the Lanham Act for false attribution of copyrights, a plaintiff must prove: (1) the work originated with the plaintiff; (2) the origin was falsely designated by the defendant; (3) the false designation was likely to cause

---

**6.** Defendants contend that they spent over $400,000 in producing the Documentary and that the issuance of a preliminary injunction would disqualify the Documentary from consideration for awards in the motion picture industry.

confusion; and (4) the plaintiff was harmed. *See Lipton v. The Nature Co.*, 71 F.3d 464, 473 (2d Cir.1995) (citing *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 781–85 (2d Cir.1994)). Once the plaintiff establishes that defendants' actions would create a likelihood of confusion, she is entitled to a presumption of irreparable harm under her Lanham Act cause of action. *See Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir.2000) (noting that, if "plaintiff does not show a likelihood of success on the merits [i.e., likelihood of confusion], it cannot obtain a preliminary injunction without making an independent showing of irreparable harm").

▪ Here, plaintiff has failed to establish a likelihood of confusion entitling her to a presumption of irreparable harm. First, the Documentary contains no representations as to copyright ownership. Second, defendants have offered the declarations of Arkoff (Arkoff Dec. ¶ 13), Fitzgerald (Fitzgerald Dec. ¶¶ 19–20), and Kende (Kende Second Dec. ¶¶ 13–15), all of whom declared in substance that anyone interested in film footage or other materials depicted in the Documentary would not rely on that "program or its credits as any kind of reference source for ascertaining the copyright status or ownership of such materials." (Arkoff Dec. ¶ 13.) These declarations are undisputed. Therefore, plaintiff has failed to establish a likelihood of success on the merits and is not entitled to presumption of irreparable harm. *See Federal Express Corp.*, 201 F.3d at 173. Accordingly, her preliminary injunction request under the Lanham Act must be denied.

▪ Plaintiff also failed to meet her burden of proving irreparable harm on her breach of contract claim. Plaintiff has failed to allege any harm that would not be fully compensable with an award of monetary damages. In fact, plaintiff's counsel suggested as much during the parties' September 28, 2000 argument when he stated that, "if [defendants] had gotten a license or even if they get a license, if they want to settle the case, perhaps they can exhibit this between now and the end of the year or next year and go for an academy award." Because plaintiff has not even attempted to establish that she was irreparably harmed by defendants' alleged breach of the parties' original licensing agreement, I need not reach plaintiff's likelihood of success on her breach of contract claim.

▪ Plaintiff has also failed to establish that her claim of unfair competition entitles her to the issuance of a preliminary injunction.[7] First, plaintiff has failed to establish tangible, imminent, irreparable harm that will ensue if defendants are not enjoined from the conduct in question. *See Cairns*, 24 F.Supp.2d at 1038 (stating that plaintiffs are required to satisfy the traditional standard of irreparable injury and likelihood of success to receive a preliminary injunction pursuant to a violation of the UPBA). Second, plaintiff is not likely to prevail on the merits of her unfair competition claim because it is preempted by the Copyright Act of 1976 since plaintiff is seeking to vindicate rights protected under 17 U.S.C. § 106 and the works at issue fall within the ambit of copyright

7. Although plaintiff does not specify, I assume she brings this cause of action pursuant to the California Unfair Business Practices Act ("UBPA"), Cal. Bus. & Prof.Code §§ 17200 *et seq.*, which defines unfair competition as "any unlawful, unfair or fraudulent business act or practice." To state a claim under the UBPA, "one need only show that 'members of the public are likely to be deceived.'" *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1037 (C.D.Cal.1998) (citation omitted).

protection. *See* 17 U.S.C. § 301 (stating in pertinent part that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title"); *National Basketball Assoc. v. Motorola, Inc.,* 105 F.3d 841, 848–851 (2d Cir.1997); *Motown Record Corp. v. George A. Hormel & Co.,* 657 F.Supp. 1236, 1238–40 (C.D.Cal.1987) (finding that plaintiff's unfair competition claim brought under California Business and Professions Code §§ 17200 *et seq.* and § 17500 were preempted by the Copyright Act). Accordingly, plaintiff's preliminary injunction application is denied on her unfair competition claim.

▮ Finally, plaintiff also failed to establish the existence of irreparable harm on her claim brought under California's publicity rights statute, Section 3344.1 of the California Civil Code. *See Michaels v. Internet Entertainment Group, Inc.,* 5 F.Supp.2d 823, 836 (C.D.Cal.1998) (noting that a party may seek to enjoin others from exploiting their name or likeness under California's publicity statute in addition to bringing an action for damages). Nothing in the statute affords litigants a presumptive right to a preliminary injunction; therefore, plaintiff was required to

establish irreparable injury and likelihood of success on the merits. *See id.* at 837–38. Here, plaintiff has failed to offer any evidence that defendants' use of Nicholson's "likeness" in the Documentary will irreparably harm plaintiff's property interest in his name and likeness. To the contrary, it is clear from the parties' submissions that plaintiff encouraged defendants to portray Nicholson's career in a positive light and actually provided defendants with the photographs that underlie this cause of action. The fact that she now demands compensation for defendants' use of the photos in the Documentary belies any claim that defendants' use of the photos caused some irreparable injury to her. Accordingly, plaintiff has not met her burden of demonstrating irreparable harm, and her preliminary injunction application pursuant to Section 3344.1 must be denied.[8]

### Likelihood of Success/Substantial Questions on the Merits on Plaintiff's Copyright Claims

With respect to all of her claims, plaintiff has failed to demonstrate a likelihood of success on the merits. With respect to her infringement action, plaintiff is unlikely to prevail on the merits of her copyright

---

**8.** Assuming, *arguendo*, that plaintiff had established some irreparable injury, the Court would nonetheless deny her preliminary injunction application because plaintiff has failed to demonstrate a likelihood of success on the merits of her claim brought under Section 3344.1. Section 3344.1(a)(2) states in pertinent that "[f]or purposes of this subdivision, a . . . audiovisual work, radio or television program, . . . shall not be considered a product, article of merchandise, good, or service if it is fictional or nonfictional entertainment"; *see also Astaire v. Best Film & Video Corp.,* 116 F.3d 1297, 1301–02 (9th Cir.1997) (stating that films, videotapes, and television programs are exempted from Section 3344.1). Therefore, based on my reading of the statute and the way California courts have interpret-

ed it, plaintiff has failed to establish a likelihood of success on the merits. I also note that plaintiff's cause of action brought under Section 3344 may be preempted by 17 U.S.C. § 301, *see Motown Record Corp.,* 657 F.Supp. at 1240–41 (holding that "the basic act which constitutes the alleged infringement—the unauthorized use of plaintiffs' composition—is the same as that of copyright and is therefore preempted"), because the conduct that plaintiff claims violated her rights under § 3344.1 is identical to the conduct that forms the basis for her copyright infringement claim with respect to the photographs of her late husband. I do not need to resolve that issue, however, to find that plaintiff has failed to meet her burden for purposes of a preliminary injunction.

infringement claim because defendants' use of the copyrighted works at issue are likely to be considered fair and because it is probable that plaintiff gave defendants express and implied licenses that authorized the conduct plaintiff now characterizes as infringing.

Section 107 of the Act, 17 U.S.C. § 107,[9] states that the "fair use" of a copyrighted work does not infringe the copyright in that work. "Whether use of copyrightable expression is fair is determined on a case-by-case basis within the context of the four non-exclusive factors enumerated in section 107." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir.1991) (citing *Harper & Row, Pub., Inc. v. Nation Enterprises, Inc.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). "Fair use is a mixed question of law and fact." *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218. The factors to be considered include:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Defendants carry the burden of showing that their infringing use was fair. *See Coleman v. ESPN, Inc.*, 764 F.Supp. 290 (S.D.N.Y.1991).

### Purpose and Character of Use

■ The first statutory factor is the purpose and character of the allegedly in-

fringing use. The focus of this factor is "whether the new work merely supersedes the objects of the original creation ... or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (citations omitted). Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright.... [T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579, 114 S.Ct. 1164.

Here, defendants' Documentary will likely be found to be "transformative" on the trial of this matter; it does not merely purport to supersede the original works at issue, but to create a new copyrightable documentary. While plaintiff's copyrighted movies aimed to entertain their audience, defendants' Documentary aims to educate the viewing public of the impact that Arkoff and Nicholson had on the movie industry. The Documentary appears intended to add something of value rather than simply copying the copyrighted expression that it documents. Indeed, it seems likely to stimulate a market for the original rather than replace it. Just as a parody "needs to mimic an original to make its point," *see Campbell*, 510 U.S. at 580–81, 114 S.Ct. 1164, and a biographer is permitted to quote his subject, *see New Era Publications, Int'l v. Carol Pub. Group*, 904 F.2d 152, 156 (2d Cir.1990), so too a documentary about two film makers

---

9. Section 107 states in pertinent part:
   [T]he fair use of a copyrighted work, including such use by reproduction in copies or phono records or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

should be permitted to sparingly show clips of the subjects' works, the materials they used to promote and create those works, and a handful of photographs depicting the late Nicholson. The fact that the alleged infringing work appears to fall within Section 107's list of uses such as "criticism, comment, ... or research" creates a presumption that factor one favors a finding of fair use.[10] *See e.g., Wright,* 953 F.2d at 737; *New Era,* 904 F.2d at 156 (noting that, if a work falls into one of Section 107's categories, "assessment of the first fair use factor should be at an end").

Plaintiff argues that the fact that defendants will profit from the exhibition of the Documentary to over "67,000,000 paying cable subscribers" weighs against a finding of fair use. The commercial nature of the Documentary, while significant, is not dispositive in light of the Documentary's transformative nature. *See Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 (stating that, if "commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107"). Accordingly, the purpose and character of the Documentary favors a finding of fair use.

### Nature of Copyrighted Work

■ The second factor looks to the value of materials used and "calls for recognition that some works are closer to the core of intended copyright protection than others." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. The more the infringed material resembles the original, creative expression, the more likely it will be that it falls "within the core of copyright's protective purposes." *Id.* Whether a work is published or unpublished is also a critical element of its "nature." *See Harper & Row,* 471 U.S. at 564, 105 S.Ct. 2218. In the case of a published work, "even substantial quotations might qualify as fair use." *Id.*

Here, the nature of the copyrighted material at issue is a combination of both creative expression, i.e., the film clips, the poster, model monsters, and less creative expression such as the still photographs of Mr. Nicholson. The bulk of the copyrighted material at issue is creative expression, lying at the core of copyright protection. *See Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. At the same time, the same works have previously been published through the release of AIP's films and posters to the public.[11] Defendants did not usurp the author's first publication rights for those works, giving them a slightly wider degree

10. Plaintiff argues that the Documentary was produced to "entertain" audiences, a goal not mentioned in Section 107 and should, accordingly, not receive fair use protection. However, the type of uses listed in Section 107 are illustrative and not exhaustive. *See* 17 U.S.C. § 107; *see also Campbell,* 510 U.S. at 577–78, 114 S.Ct. 1164. Second, a work can be both entertaining and at the same time educate, criticize, comment, etc. *See e.g., Monster Communications v. Turner Broadcasting System, Inc.,* 935 F.Supp. 490, 493–94 (S.D.N.Y. 1996) (noting that the biography at issue can "undeniably constitute[ ] a combination of comment, criticism, scholarship and research, all of which enjoy favored status under § 107") (quotation omitted).

11. The only allegedly infringed work that was unpublished at the time the lawsuit was filed was one of the photographs of the late Mr. Nicholson that plaintiff had provided to defendants. That fact alone is not dispositive on the issue of fair use. *See* 17 U.S.C. § 107 (stating that "[t]he fact that a work is unpublished shall not itself base a finding of fair use if such finding is made upon consideration of all the [ ] factors [listed in section 107]"). I find that defendants' use of plaintiff's unpublished photo was fair in light of the factors listed in Section 107.

of latitude in making a fair use claim. *See id.* ("The right of first publication encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work."). On balance, the nature of the material at issue slightly favors a finding against fair use.

### Amount and Substantiality of Portion Used

■ This factor looks to the amount and substantiality of the portion used in relation to the copyrighted work as a whole. This factor "has both a quantitative and a qualitative element to it. As a result, the factor has favored copyright holders where the portion used formed a significant percentage of the copyrighted work, or where the portion used was essentially the heart of the copyrighted work." *Wright,* 953 F.2d at 738 (internal citations omitted).

Here, the film clips used do not amount to a substantial portion of the overall copyrighted works. Defendants state without contradiction that an average of twenty-six seconds from each of the films in question appears in the Documentary, ranging from as little as ten seconds to as much as fifty-four seconds. Defendants exhibited a 14.87–second clip from "The Amazing Colossal Man," a 21.33–second clip of the poster promoting the film "Apache Women," a 43.77–second clip exhibiting models of the monsters *Beulah* and *Saucerman,* and 37.43 seconds of clips showing the unpublished photos of the late Mr. Nicholson. Such *de minimus* amounts of a full-length feature film and such *de minimus* showings from the originals favor a finding of fair use. *See, e.g., Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,* 166 F.3d 65, 71 (2d Cir.1999) ("[D]e minimis infringement of a copyrighted work is

not actionable."). Plaintiff argues that the fact that defendants paid to exhibit clips of shorter duration than those at issue in the infringement claims and sought to obtain a license to exhibit a clip from "The Amazing Colossal Man" demonstrates that defendants were aware that the uses at issue were not "fair." However, an equally persuasive inference is that defendants sought to avoid litigation. *See Campbell,* 510 U.S. at 585 n. 18, 114 S.Ct. 1164 (rejecting plaintiffs' claim that the fact defendant originally sought permission from plaintiffs belies a finding of fair use because "the offer may simply have been made in a good-faith effort to avoid this litigation"); *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1264 (2d Cir.1986).

Nor can it be said persuasively at this point that the infringing material gets at the "heart" of the copyrighted works. *See e.g., Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. 2218; *Wright,* 953 F.2d at 738.[12] No more seems to have been taken than was necessary for defendants to produce the Documentary. *See Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 110 (2d Cir.1998). Defendants' Documentary tracks the progression of AIP from its inception through its eventual demise, noting its evolution from monster genre films such as "I Was A Teenage Werewolf" to films glorifying the rebellious youth of the 1950's and '60's such as "Beach Blanket Bingo" and "Bikini Beach Party" and, finally, attempting to create films that captured the experimental drug age and anti-war sentiment of the late 1960's and early '70's in films like "The Wild Angels" and "The Trip." It goes without saying that in order to effectively depict the character and nature of AIP's evolution, some exhibition of actual movie clips, props used to

---

**12.** Though defendants may have qualitatively used the substance of the photographs and poster at issue, those uses were so *de minimus* that the third factor also favors a finding of fair use with respect to those works.

create AIP's revered low-budget special effects, misleading posters used to promote AIP's films by promising more in advertisements than the films actually delivered, and momentary shots of the late Nicholson—one of the principals behind the small studio—was necessary. After reviewing the Documentary, I do not find for purposes of plaintiff's preliminary injunction application that defendants took more than was necessary in light of the subject matter of their Documentary. Accordingly, the amount and substantiality of copyrighted material in the Documentary favors a finding of fair use as well.

### Effect of Use upon Potential Market

■ The fourth factor focuses on the effect the infringing conduct will have upon the potential market for or value of the copyrighted work. *See* 17 U.S.C. § 107(4). Analyzing the fourth factor requires the Court to balance "the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir.1981). " 'Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied.' " *Harper & Row*, 471 U.S. at 566–67, 105 S.Ct. 2218 (quoting 3 Nimmer § 13.05(a)); *see also Infinity Broadcast Corp.*, 150 F.3d at 110 (noting that the fourth factor is concerned with usurping a "market that properly belongs to the copyright-holder").

Here, plaintiff has not articulated any tangible way in which defendants' Documentary will reduce the potential market for her copyrighted works. *See Harper & Row*, 471 U.S. at 567, 105 S.Ct. 2218 (noting that, "once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue," the burden shifts to the infringer to show that the loss would have occurred without the taking of copyrighted expression). The alleged infringing clips "are too few, too short, and too small in relation to the whole" to undercut the market for plaintiff's copyrighted works. *Monster Communications*, 935 F.Supp. at 495. To the contrary, after viewing the documentary, I find at this point that it the Documentary may increase market demand for plaintiff's copyrighted works and make more people aware of the influence that AIP had in developing the "B" movie genre. Moreover, defendants' brief display of the photographs, poster, and model monsters at issue should only increase consumer demand as well as the value of those items after the Documentary heightens public awareness of AIP's role in shaping Hollywood productions.

Plaintiff claims that she will lose the licensing value of her copyrighted works if defendants' use is deemed "fair." Plaintiff's argument is flawed. First, plaintiff's claim of market usurpation is misguided; the question is what effect will the exhibition of defendants' Documentary have on the demand for plaintiff's infringed works themselves, not the effect the Documentary will have on her ability to license those works in the future. *See Monster*, 935 F.Supp. at 495. Second, plaintiff's argument, if carried to its logical conclusion, would eviscerate the affirmative defense of fair use since every copyright infringer seeking the protection of the fair use doctrine could have potentially sought a license from the owner of the infringed work. The very point of fair use is that, in certain circumstance, such as the one at bar, the law will not require an infringer of a copyrighted work to obtain such a license if it advances the overall goal of copyright—to create more works. *See Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966) (not-

ing that the doctrine of fair use is described as the "privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner"); *see also* Pierre N. Leval, "Toward a Fair Use Standard," 103 *Harv. L.Rev.* 1105, 1107 (1990) (noting that the copyright is designed "to stimulate activity and progress in the arts for the intellectual enrichment of the public"). Third, plaintiff's argument fails to acknowledge that a finding of fair use here does not translate to a finding of fair use in each instance where plaintiff's copyrighted works have been infringed. Thus, potential infringers of plaintiff's copyrighted works, to the extent that they exist, are likely to seek a license to avoid entering the murky realm of fair use law during the course of litigation.

While plaintiff's market share would not appear to substantially benefit from denying defendants' claim of fair use and could actually be negatively affected, I find that the public would be hindered by a denial of defendants' fair use defense. Defendants have gone to considerable length to create a film that documents the origins of AIP and its significant impact on the American movie industry. It contains information which, if the general public does not find interesting, at the very least, movie aficionados across the country will find informative and entertaining. *See Campbell,* 510 U.S. at 578 n. 10, 114 S.Ct. 1164 (noting that injunctive relief may be withheld when there is "a strong public interest in the publication of the second work [and] the copyright owner may be adequately protected by an award of damages") (quotation omitted). Accordingly, the fourth factor also favors a finding of fair use.

Thus, although the record is not as complete as it might be, given the expedited nature of these proceedings, the balance of factors prescribed in a fair use analysis favors a finding of fair use for the purposes of plaintiff's preliminary injunction application. *See Wright,* 953 F.2d at 740 (stating that the district court correctly granted defendants summary judgment where three of the four factors clearly favored the defendants). Accordingly, since plaintiff seems at this stage of the litigation unlikely to prevail on the merits, even assuming that she has protectable rights in the works in question, because defendants are likely to establish that their use is a fair one within the meaning of the Copyright Act, plaintiff's motion for a preliminary injunction is denied.[13]

**13.** Nor can plaintiff establish serious questions going to the merits and a balance of hardships tipping decidedly in her favor. Assuming *arguendo* that plaintiff had established a sufficient prospect of success on the merits, which she has not, the Court would nonetheless deny her preliminary injunction application on the balance of the equities.

Defendants have spent over $400,000 in producing the Documentary over an eighteen-month period. Plaintiff has been in contact with the defendants from the Documentary's inception. Plaintiff granted an on-screen interview, provided defendants with photographs, and granted them a license which, at the minimum, granted defendants the right to use six AIP clips and, at maximum, granted virtually all of the rights alleged to have been infringed. Plaintiff's communications with defendants and her expressed enthusiasm over the Documentary's evolution are undisputed. Plaintiff also specifically asked defendants to add twenty of her acquaintances to the list of guests for defendants' celebrity, theatrical screening fourteen days prior to the date of the event. The Documentary is now in its final form and has been submitted to the Academy for award consideration. Moreover, it is undisputed that defendants have made an arrangement with Arkoff to help publicize the Documentary after the nominees for award consideration are publicized, and that enjoining defendants from airing the Documentary at that time would irreparably injure their commercial investment in the Documentary.

142

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Accordingly, I find that enjoining defendants from exhibiting the Documentary at this juncture presents a more compelling case of irreparable harm than does plaintiff's, especially in light of the fact that plaintiff has failed to allege any harm that does not appear fully compensable with an assessment of monetary damages. *See Campbell*, 510 U.S. at 578 n. 10, 114 S.Ct. 1164 (citations omitted). Accordingly, the balance of equities does not favor plaintiff, and her preliminary injunction must be denied.